IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| In re: | * | |
| FPMI Solutions, Inc. | * | Case No: 16-12142 REM |
| | * | (Chapter 11) |
| Debtor | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

**MOTION FOR AN ORDER (I) APPROVING BID PROCEDURES, (II) AUTHORIZING THE DEBTOR TO SELECT A STALKING HORSE AND APPROVING CERTAIN BID PROTECTIONS IN CONNECTION THEREWITH, (III) SCHEDULING RELATED DEADLINES, (IV) APPROVING MANNER OF NOTICES, AND (V) GRANTING RELATED RELIEF**

FPMI Solutions, Inc., the debtor and debtor in possession herein ("FPMI" or the "Debtor"), by counsel, files this Motion for an Order (I) Approving Bid Procedures, (II) Authorizing the Debtor to Select a Stalking Horse and Approving Certain Bid Protections in Connection Therewith, (III) Scheduling Related Deadlines, (IV) Approving Manner of Notices, and (V) Granting Related Relief (this "Motion"), and in support thereof states as follows:

Jurisdiction and Venue

1. The Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(N).[1]

2. Venue before this Court is proper under 28 U.S.C. §§ 1408 and 1409.

3. The statutory predicates for the relief requested herein are Bankruptcy Code §§ 105 and 363 and Bankruptcy Rules 2002 and 6004.

Background

4. On June 20, 2016 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The Debtor continues in possession

---

[1] Unless otherwise stated, all "Section" references are to the Bankruptcy Code, and all "Rule" references are to the Federal Rules of Bankruptcy Procedure.

of its property and manages its financial affairs as a debtor in possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

5. No official committee of unsecured creditors has been appointed.

6. No request for a trustee or examiner has been made in this Chapter 11 case.

7. The Debtor has various assets including furniture, fixtures, equipment, inventory, bank account balances, and government contract receivables (the "Assets") which it intends to market and sell.

Background Relevant to the Relief Requested

8. The Debtor, through the filing of this Motion, is seeking authorization to establish procedures substantially in the form attached hereto as **Exhibit 1** (the "Bid Procedures") to govern the process by which the Debtor may complete its marketing of the Assets and consummate a sale of its assets and an assignment and assumption of certain contracts (the "Sale") and the Court's approval of bid protections and procedures. The Debtor intends to solicit and evaluate bids for a Sale from interested parties in accordance with the terms of the Bid Procedures. Thereafter, the Debtor intends to file a Motion for Approval of Sale of Assets Free and Clear (the "Motion to Sell"). The Motion to Sell will be noticed and served in accordance with applicable bankruptcy law and consistent with the Bid Procedures. It is anticipated that any Overbid and Sale Hearing (defined below), will be scheduled within the next 30 days.

9. The Bid Procedures are the culmination of discussions with the Debtor's secured lender, the input provided by the Debtor's professionals, and the Debtor's exercise of its business judgment.

10. Approval of the Bid Procedures is intended to achieve the ultimate goal of the Debtor's Chapter 11 reorganization maximizing the value available to all creditors and stakeholders in the bankruptcy case. To that end, the Debtor believes that this Court's approval of the Bid Procedures will enable it to solicit competing offers for the Assets in a controlled

manner that will ensure maximum recovery for the estate. Moreover, to obtain the anticipated benefits of the proposed Sale, it is imperative that the process be completed within a timeframe that allows for a prompt reorganization and exit from Chapter 11.

11. Since February, 2016, the Debtor has marketed the Assets to various potential buyers. Debtor is currently in negotiations with one buyer with a potential sale on the horizon. The Debtor intends to continue, subject to the Court's approval, to market the Assets pursuant to the proposed terms of the Bid Procedures. The Debtor expects that there will be multiple qualified bids, which will be subjected to an overbid process to be finalized at an overbid and sale hearing before the Court (the "Overbid and Sale Hearing"). The Debtor believes that marketing and selling the Assets under the Bid Procedures will culminate in a Sale for the highest and best bid for the Assets.

12. Pursuant to the Bid Procedures, qualified bidders will be required to deliver an executed Asset Purchase Agreement (the "Agreement") substantially in the form of **Exhibit 2** hereto.

### Summary of Bid Procedures[2]

13. The Bid Procedures specify the process pursuant to which the Debtor, with the assistance of its retained professionals, will:

(a) Continue to market the Assets;

(b) Assist interested parties with due diligence on the Assets;

(c) Conduct an overbid process at the Overbid and Sale Hearing in the event there is a Stalking Horse or more than one qualified bidder for the Assets;

(d) Select a Successful Bidder (as defined herein); and

(e) Consummate the Sale after Court approval.

14. The Debtor submits that the Bid Procedures are fair and reasonable and are necessary to allow the Debtor to solicit and evaluate bids through a controlled process. The

---

[2] This summary of the Bid Procedures is set forth herein for the convenience of the parties receiving this Motion. In the event that there is any inconsistency between the provisions of this summary and the Bid Procedures, the Bid Procedures will control. See Exhibit 1.

4832-6503-2246, v. 1          - 3 -

Bid Procedures will provide potential purchasers with predictability and orderliness during the sale of the Assets. Finally, the Debtor believes that, if implemented, the Bid Procedures will result in the highest offer for the Assets.

### Selection of Stalking Horse and Related Bid Protections

15. Pursuant to the Bid Procedures, the Debtor may, but is not required to solicit and select a purchaser, whose terms and conditions will be disclosed in a filing before the Court, as the first bid being made on the Debtor's Assets, a "Stalking Horse Bid"[3]. The Debtor anticipates that it may select a Stalking Horse prior to the hearing on this Motion. Accordingly, in the event the Debtor selects a Stalking Horse, the Debtor will file a notice with this Court (the "Stalking Horse Notice"), which will (i) identify the Stalking Horse, (ii) include a copy of the Sale Agreement executed by the Stalking Horse (the "Stalking Horse Agreement"), and declare whether a Break-up Fee (defined below) is being proposed for the Stalking Horse.

### Overbid Protections

16. Pursuant to the Bid Procedures, the Debtor may, but is not required, to offer the Stalking Horse, if any, bid protections in the form of a break-up fee equal to the lesser of thirty thousand dollars ($30,000) or actual costs incurred (the "Break-up Fee"). The Break-up Fee shall be paid to the Stalking Horse upon the occurrence of all of the following: (i) the Debtor shall have selected a party other than the Stalking Horse as offering the highest and best bid, (ii) the Bankruptcy Court shall have entered an order approving a sale of the Assets to a party other than the Stalking Horse, and (iii) the closing of the sale of the Assets to a party other than the Stalking Horse (the "Alternate Sale") shall have concluded. The Debtor proposes that the Break-up Fee, if any, will constitute a lien against the proceeds of an Alternate Sale and will be entitled to status and payment as an administrative expense in the Bankruptcy Case under Sections 503(b), 506 and 507(a)(1) of the Bankruptcy Code. A notice in compliance with Fed.R.Bankr.P. 2002 is filed herewith.

---

[3] The definition of "stalking horse bid" is: "an offer or bid designed to test the market for an asset often ahead of a formal auction. A stalking horse bid effectively places a floor underneath a proposed asset sale. Typically, a stalking horse agreement also includes a provision allowing the stalking horse offer maker an option to top any rival bids that emerge." See *Financial Times Lexicon*.

### Overbid and Sale Hearing

17. Pursuant to the Bid Procedures, the Debtor intends to subject qualified offers for the Assets to an overbid process at the Overbid and Sale Hearing. After the conclusion of the overbid process, the Debtor will then seek this Court's approval of the Sale with the Successful Bidder (as defined in the Bid Procedures) free and clear of all liens, claims and encumbrances pursuant to Bankruptcy Code § 363, with all liens, claims and encumbrances to attach to the proceeds of the Sale with the same validity and in the same order of priority as they attached to the Assets prior to the Sale. The Debtor will present additional information, as necessary, at the Overbid and Sale Hearing and submit that the Sale contemplated herein is fair, reasonable and in the best interest of its estate.

18. The Debtor seeks to consummate the Sale as quickly as possible, maximizing value for its estate and its creditors. The Debtor will provide notice of the Overbid and Sale Hearing and the Motion for Approval to Sell.

19. The Debtor anticipates that the Bid Procedures will provide interested parties with ample notice of the sale and overbid process and sufficient time to fully market and consummate the Sale. The proposed timeline provides qualified bidders more than sufficient time to conduct due diligence regarding the Assets and, if interested in participating in the overbid process at the Overbid and Sale Hearing, to submit a Qualified Bid (as defined in the Bid Procedures).

### Manner of Notice

20. After approval of the Bid Procedures at the hearing on August 16, 2016, the Debtor will serve all notices in accordance with Rule 2002, 4001(d) and 6004, where applicable, and upon the following parties, and their counsel, if known:

    (a)    the U.S. Trustee;

    (b)    the Stalking Horse, if any, and its counsel;

    (c)    all entities known to have expressed an interest in acquiring the Assets;

    (d)    all parties known to be asserting a lien on any of the Debtor's assets;

    (e)    all federal, state and local taxing authorities with jurisdiction over the Debtor's business;

    (f)    all known creditors of the Debtor; and

    (g)    all other parties that have filed a notice of appearance and demand for service of papers in this Chapter 11 case under Bankruptcy Rule 9010(b) as of the date of entry of the Procedures Order (collectively, the "Notice Parties").

21. The Debtor proposes to serve notices by first-class mail and, where available, through ECF and/or electronic mail and file a certification of such service. The notice of this Motion provides that any party that has not received a copy of the Bid Procedures that wishes to obtain a copy of such documents may make such a request, in writing, to Yumkas, Vidmar, Sweeney & Mulrenin, LLC, 10211 Wincopin Circle, Suite 500, Columbia, Maryland 21044, Attn: Paul Sweeney, email: psweeney@yvslaw.com.

## Argument

22. Bankruptcy Code § 363(b) provides that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). Bankruptcy Code § 105(a) provides that the bankruptcy court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code. 11 U.S.C. § 105(a).

23. The procedures and deadlines set forth in this Motion and in the Bid Procedures will permit a reasonable and expeditious sale process that is designed to minimize the costs of administering this Debtor's bankruptcy estate and at the same time provide the Debtor with the necessary time to fully market and maximize the same, all for the benefit of the Debtor's creditors. Accordingly, the Court should grant the relief requested in this Motion.

24. The approval of a Break-up Fee to the Stalking Horse Bidder is warranted under the facts of this case and applicable law. A Break-up Fee incentivizes bidding and participation in the sale process where bidders might otherwise hesitate in spending significant resources on due diligence.

25.     Break-up fees are also known as topping fees or bid protection.  A break-up fee is paid to a stalking horse only in the event another bidder is the successful purchaser.  See *In re Financial News Network, Inc.*, 1991 Bankr. LEXIS 1457 (Bankr. S.D. N.Y. 1991). Although the amount is usually a percentage of the amount over the stalking horse's bid, the Debtor has provided that the Stalking Horse will be sufficiently protected for its actual costs incurred up to a ceiling of thirty thousand dollars ($30,000).

26.     Courts have generally recognized that break-up and topping fees are common in corporate transactions.  *See, e.g., Cottle v. Storer Communications, Inc.*, 849 F.2d 570 (11th Cir. 1988); *CRTF Corp. v. Federated Department Stores*, 683 F.Supp. 422 (S.D. N.Y. 1988); *Samjens Partners I v. Burlington Indus.*, 663 F.Supp. 614 (S.D. N.Y. 1987); *Revlon Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173 (Del. Super. Ct. 1985).  In the context of an asset sale, break-up fees are presumptively appropriate under the business judgment rule, unless there is evidence of self-dealing or other fraud.  Berman, Using Bidding Incentives In Bankruptcy Asset Sales, N.Y.L.J., May 9, 1991, at 5, col. 1.

27.     Courts determine the validity of break-up or topping fees based on whether the party seeking the fee has enhanced the bidding process, and whether the fee agreement is in the best interests of the seller's shareholders.  *Integrated Resources, supra, CTRF Corp., supra; Samjens Partners, supra.*  The rationale for this test is that once an asset is listed for sale, the corporate directors' fiduciary obligation is to maximize the price received for the benefit of shareholders.  Accordingly, a break-up fee will be permitted if it facilitates an auction and helps maximize value for creditors and possibly shareholders.

28.     Three different standards have emerged for evaluating the validity of breakup and topping fees.  *See In re Tiara Motorcoach Corp.*, 212 B.R. 133 (Bankr. N.D. Ind. 1997), *In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527 (3d Cir. 1999).

29.     One standard developed in *In re 995 Fifth Avenue Associates, L.P.*, 96 B.R. 24 (Bankr. S.D. N.Y. 1989) is a variation of the business judgment rule. See *Official Committee v. Integrated Resources, Inc. (In re Integrated Resources Inc.)*, 147 B.R. 650, 657

(S.D. N.Y. 1992); s*ee also In re RSL COM Primecall, Inc.*, 2002 Bankr. LEXIS 367 (Bankr. S.D. N.Y. Apr. 11, 2002); *In re Bidermann Indus. USA Inc.*, 203 B.R. 547, 552 (Bankr. S.D. N.Y. 1997). In *Integrated Resources*, the court analyzed the following criteria in determining whether to award a breakup fee — whether the fee (i) was tainted by self-dealing or manipulation; (ii) hampered rather than encouraged bidding; and (iii) was reasonable relative to the proposed purchase price. *Integrated Resources, supra* at 657.

30. The "best interests of the estate" standard is derived from *In re American West Airlines, Inc.*, 166 B.R. at 911. In this case the court held that fees should be examined on a basis of "whether the interests of all concerned parties are best served by such a fee." *Id. See also In re Wilde Horse Enterprises, Inc.*, 136 B.R. 830 (Bankr. C.D. Cal. 1991); *In re Wintz Companion*, 230 B.R. 840 (B.A.P. 8th Cir. 1999); *Matter of Tiara Motorcoach Corp.*, 212 B.R. 133 (Bankr. N.D. Ind. 1997); *America West Airlines*, 166 B.R. 908 (Bankr. D. Ariz. 1994); *In re Hupp Industries, Inc.*, 140 B.R. 191 (Bankr. N.D. Ohio 1992). For a discussion of the business judgment and best interests of the estate standards, *see Tiara Motorcoach, supra*.

31. Finally, the Third Circuit developed a different approach to evaluating fees in *In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527 (3d Cir. 1999). The court declined to adopt either of the above tests, but instead found that fees arrangements must be considered under the general administrative expense jurisprudence of § 503(b) of the Bankruptcy Code. The court held that breakup fees are allowable only if they are "actually necessary to preserve the value of the estate." *Id.* at 535. In applying this standard, the court focused on whether the bid in question served as a "catalyst" for higher bids and whether the stalking horse would have undertaken the cost of submitting a bid even in "the absence of any promise of reimbursement." *Id.* at 537. The Third Circuit, therefore, requires careful scrutiny of the actual benefit to the debtor's estate.

32. Regardless of the specific standard applied, certain facts tend to strongly influence whether fees will be approved or denied. Breakup fees paid to insiders/fiduciaries are not per se prohibited, but are subject to heightened scrutiny due to the possibility of abuse and

self-interested dealings. *See In re Bidermann Industries, Inc.*, 203 B.R. 547, 550 (Bankr. S.D. N.Y. 1997); *C&J Clark America, Inc. v. Carol Ruth, Inc. (In re Wingspread Corporation)*, 92 B.R. 87 (Bankr. S.D. N.Y. 1988); *Integrated Resources, supra*. Additionally, courts tend to approve fees totaling between one and four percent of the eventual purchase price, absent unusual circumstances.[4]

33. In this case, the authorization of a break-up fee is justified under any of these standards. The bid protection is proposed as an arm's length transaction. There is no self-dealing or manipulation and the proposed reimbursement of actual costs up to a ceiling of thirty thousand dollars ($30,000) is reasonable in comparison to the overall purchase price that is anticipated. Further, the reimbursement of actual costs sufficiently protects the Stalking Horse's bid. This is also an appropriate exercise of the Debtor's business judgment because it encourages bidding and a maximization of the sales price. As such, it is a sensible and strategic

---

[4] Break-up fees and break-up expenses in the bankruptcy context were first considered in the 1980s. A representative survey of the cases follows, in order of lowest to highest percentage break-up fee or expenses approved:

*In re 995 Fifth Ave. Assocs.,* 96 B.R. 24 (Bankr. S.D. N.Y. 1989) (0.68% break-up fee of $500,000 for a $73,725,000 purchase price is reasonable); *In re Kidron, Inc.,* 278 B.R. 626 (Bankr. M.D. Fla. 2002) (0.91% break-up fee of $100,000 for an $11 million purchase price is reasonable); *In re Integrated Res., Inc.,* 147 B.R. 650, 652 (S.D. N.Y. 1992) (1.06% break-up fee of $6 million-constituting 3. 2% of actual expenses—for a $565 million purchase price is reasonable); *In re Crowthers McCall Pattern, Inc.,* 114 B.R. 877 (Bankr. S.D. N.Y. 1990) (1.11% break-up fee of $500,000 for a $45 million purchase price is reasonable); *In re Genicom,* Case No. 00–1383(PJW) (Bankr. D. Del. 2000) (1. 2% break-up fee is reasonable); *In re S.N.A. Nut Co.,* 186 B.R. 98 (Bankr. N.D. Ill. 1995) (1. 22% break-up fee of $350,000 for a $28.8 million purchase price is reasonable); *In re APP Plus, Inc.,* 223 B.R. 870 (Bankr. E.D. N.Y. 1998) (1. 25% break-up fee of $250,000 for a $20 million purchase price is reasonable); *In re Lamb,* No. 96-1-1099-DK, 2002 WL 31508913 (Bankr. D. Md. Oct.11, 2002) (1.48% break-up fee of $9,902. 20 for a $670,000 purchase price is reasonable); *In re CellNet Data Systems, Inc.,* Case No. 00–844(PJW) (Bankr. D. Del. 2000) (2. 2% break-up fee is reasonable); *In re PennCorp Financial Group, Inc.,* Case No. 00–888 (PJW) (Bankr. D. Del. 2000) (2.3% break-up fee is reasonable); *In re CXM, Inc.,* 307 B.R. 94 (Bankr. N.D. Ill. 2004) (2.59% break-up fee of $200,000 for a $7,726,056 purchase price is reasonable); *In re ARM Financial Group, Inc.,* Case No. 99–4430 (PJW) (Bankr. D. Del. 2000) (3% break-up fee is reasonable); *In re Hupp Indus., Inc.,* 140 B.R. 191, 193–94 (Bankr. N.D. Ohio 1992) (3.16% break-up fee of $150,000 for a $4.75 million purchase price is reasonable); *Gey Associates General Partnership v. 310 Assocs., L.P.,* No. 02 Civ.0710 (SHS), 2002 WL 31426344 (S.D. N.Y. Oct. 29, 2002) (3. 23% break-up fee of $100,000 for a $3.1 million purchase price is reasonable); *In re FSC Corp.,* Case No. 00–B–04659 (Bankr. N.D. Ill. 2000) (3.4% break-up fee is reasonable); *In re O'Brien Envtl. Energy, Inc.,* 181 F.3d 527, 536 (3d Cir. 1999) (break-up fee of approximately 4% is reasonable in relation to the purchase price); *In re Paging Network, Inc.,* Case No. 00–3098 (GMS) (7. 24% break-up fee is reasonable); *In re Philip Servs. Corp.,* Case No. 03–37718 (Bankr. S.D. Tex. June 2003) (14. 29% break-up fee of $5 million for a $35 million purchase price is reasonable).

Cases in which a break-up fee was rejected as unreasonable in relation to the purchase price follow, in order from lowest to highest requested percentages:

provision that is in the best interest of the estate.  Finally, prospective buyers require market valuation, government contracting expertise, and legal services in order to complete an analysis of the property.  The proposed Break-up Fee will serve as a catalyst for undertaking those expenses.

<u>Miscellaneous</u>

34. No prior request for the relief sought in this Motion has been made to this or any other court.

35. The Debtor has served a copy of this Motion by first class mail to the Debtor's secured creditors, the twenty largest unsecured creditors, and the United States Trustee.  The Debtor requests that the notices set forth in this paragraph be deemed adequate and complete under the circumstances and that any further notice of the motion or of the relief requested herein be dispensed with and waived.

36. Filed concurrently herewith is a motion to expedite hearing on this Motion (the "Motion to Expedite").  That Motion to Expedite seeks to expedite the hearing on approval of the Bid Procedures so that a hearing may be held on August 16, 2016 at 11 a.m.  A separate notice of hearing will follow.

WHEREFORE, the Debtor respectfully request that the Court enter an order, substantially in the form filed contemporaneously with this Motion, granting the relief requested herein and such other and further relief as this Court deems appropriate.

Dated:  August 5, 2016
　　　　　　　　　　　　　　　　　　　　　*/s/ Paul Sweeney*
　　　　　　　　　　　　　　　　　　　　　Paul Sweeney, 33994
　　　　　　　　　　　　　　　　　　　　　Yumkas, Vidmar, Sweeney & Mulrenin, LLC
　　　　　　　　　　　　　　　　　　　　　10211 Wincopin Circle, Suite 500
　　　　　　　　　　　　　　　　　　　　　Columbia, Maryland  21044
　　　　　　　　　　　　　　　　　　　　　(443) 569-5972
　　　　　　　　　　　　　　　　　　　　　psweeney@yvslaw.com
　　　　　　　　　　　　　　　　　　　　　 Counsel for Debtor

## CERTIFICATE OF SERVICE

   I hereby certify that on this 5th day of August 2016, notice of filing this Motion for an Order (I) Approving Bid Procedures, (II) Authorizing the Debtor to Select a Stalking Horse and Approving Certain Bid Protections in Connection Therewith, (III) Scheduling Related Deadlines, (IV) Approving Manner of Notices, and (V) Granting Related Relief (the "Motion") was sent electronically to those parties listed on the docket as being entitled to such electronic notice, and a copy of the Motion was mailed first class, postage prepaid to the Debtor's secured creditors, the twenty largest unsecured creditors, and the United States Trustee, as shown on the attached service list.

                 */s/ Paul Sweeney*
                 Paul Sweeney

Aronson LLC
805 King Farm Boulevard
Rockville, MD 20850

Blue Cross Blue Shield
450 Riverchase Parkway East
Birmingham, AL 35298

Bosserman Ctr Conflict Resolution
1100 Camden Avenue
Salisbury, MD 21801

Canal Center TT LLC
P. O. Box 785801
Philadelphia, PA 19178

CIGNA Life Insurance Company
P. O. Box 8500 K 110
Philadelphia, PA 19178-0110

Deltek Systems, Inc.
P. O. Box 79581
Baltimore, MD 21279-0581

Dentons US LLP
233 South Wacker Drive, Suite 5900
Chicago, IL 60606-6361

Department of Justice
Executive Office for US Trustees
441 G Street NW, Suite 6150
Washington, DC 20548

Federal Hill Renewal LLC
P. O. Box 23
New Market, MD 21774

GSA Modifications LLC
4646 Roundhill Road
Ellicott City, MD 21043

ITC-DELTACOM/Deltacom 1058
P. O. Box 2252
Birmingham, AL 35246-1058

Kelly, Anderson & Associates
424 North Washington Street
Alexandria, VA 22314

Mass Mutual
Attn: N 405 DCS David Kern
1295 State Street
Springfield, MA 01111-0001

Robert K. Coulter, Asst. U.S. Attorney
Office of the U.S. Attorney
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, Virginia  22314

MCS Partnership
c/o Samples Properties
P. O. Box 264
Huntsville, AL 35801

NEC Financial Services
24189 Network Place
Chicago, IL 60673-1241

Jimmi L. Pittmon
11804 Rodeo Drive
Frisco, TX 75035-2275

Monique E. Smith
6056 Chicory Place, Suite 100
Alexandria, VA 22310

Cheryl Vinci
26187 Tuscany Drive
Millsboro, DE 19966

Syrena J. West
176 Bluegreen Way
Rockwood, TN 37584

The following parties received a copy of this filing by email:

David Schwinger, Esq.
The Law Offices of
David Schwinger PLLC
2519 P Street, NW
Washington, DC 20007
dschwinger@schwingerlaw.com

C. Kevin Kobbe
DLA Piper LLP (US)
The Marbury Building
6225 Smith Avenue
Baltimore, MD 21209
Kevin.kobbe@dlapiper.com

Robert M. McLindon
11222 Beach Mill Road
Great Falls, VA 22066
mmclindon@fpmi.com

The following parties received electronic notice of the filing:

| | | |
|---|---|---|
| Joseph A. Guzinski, Esquire<br>Jack Frankel, Esquire<br>Office of the United States Trustee<br>115 South Union Street, Room 210<br>Alexandria, Virginia 22314 | Jerald R. Hess, Esquire<br>Counsel for Western Alliance Bank<br>DLA Piper LLP (US)<br>500 Eighth Street, N.W.<br>Washington, D.C. 20004 | Jennifer Maria Kappel, Esquire<br>Counsel for Bridge Bank<br>DLA Piper, LLP<br>11911 Freedom Drive, Suite 300<br>Reston, Virginia 20190 |
| Christopher Barrett Bowman<br>Bregman, Berbert, Schwartz,<br>  Gilday LLC<br>7315 Wisconsin Ave. Ste 800W<br>Bethesda, MD 20814 | Paul Sweeney, Esquire<br>Counsel for Debtor<br>Yumkas, Vidmar, Sweeney & Mulrenin<br>10211 Wincopin Circle, Suite 500<br>Columbia, Maryland 21044 | Judy A. Robbins<br>Office of the U.S. Trustee - Region 4<br>115 South Union Street, Room 210<br>Alexandria, VA 22314 |