# EXHIBIT 2

# Form Agreement

**ASSET PURCHASE AGREEMENT**

between

**FPMI SOLUTIONS, INC.**

and

**[BUYER NAME]**

dated as of

[Date]

# TABLE OF CONTENTS

ARTICLE I DEFINITIONS ....................................................................................................................5
ARTICLE II PURCHASE AND SALE....................................................................................................9
    Section 2.01      Purchase and Sale of Assets. .....................................................................9
    Section 2.02      Excluded Assets. .......................................................................................10
    Section 2.03      Assumed Liabilities. .................................................................................10
    Section 2.04      Excluded Liabilities. .................................................................................11
    Section 2.05      Purchase Price. .........................................................................................12
    Section 2.06      Allocation of Purchase Price. ...................................................................13
    Section 2.07      Non-assignable Assets. .............................................................................13
ARTICLE III CLOSING .......................................................................................................................14
    Section 3.01      Closing. .....................................................................................................14
    Section 3.02      Closing Deliverables. ...............................................................................14
ARTICLE IV REPRESENTATIONS AND WARRANTIES OF SELLER ...........................................15
    Section 4.01      Organization and Qualification of Seller. .................................................15
    Section 4.02      Authority of Seller. ...................................................................................16
    Section 4.03      Title to Tangible Personal Property.. ........................................................16
    Section 4.04      Legal Proceedings; Governmental Orders. ..............................................17
    Section 4.05      Compliance With Laws; Permits. .............................................................18
    Section 4.06      Employee Benefit Matters. .......................................................................18
    Section 4.07      Brokers. ....................................................................................................19
    Section 4.08      No Other Representations and Warranties. ...............................................20
ARTICLE V REPRESENTATIONS AND WARRANTIES OF BUYER ............................................20
    Section 5.01      Organization and Authority of Buyer. ......................................................20
    Section 5.02      Authority of Buyer ...................................................................................20
    Section 5.03      No Conflicts; Consents. .............................................................................21
    Section 5.04      Brokers. ....................................................................................................21
    Section 5.05      Sufficiency of Funds. ...............................................................................21
    Section 5.06      Solvency....................................................................................................21
    Section 5.07      Legal Proceedings. ...................................................................................22
    Section 5.08      Independent Investigation. ........................................................................22
ARTICLE VI COVENANTS .................................................................................................................22
    Section 6.01      Conduct of Business Prior to the Closing. ...............................................22
    Section 6.02      Access to Information. ..............................................................................22
    Section 6.03      Supplement to Disclosure Schedules. ......................................................23
    Section 6.04      Employees and Employee Benefits. ..........................................................23
    Section 6.05      Intentionally omitted. ...............................................................................24
    Section 6.06      Governmental Approvals and Consents. ...................................................24
    Section 6.07      Books and Records....................................................................................25
    Section 6.08      Closing Conditions....................................................................................26
    Section 6.09      Public Announcements. .............................................................................26
    Section 6.11      Transfer Taxes...........................................................................................26
    Section 6.12      Further Assurances....................................................................................26

ARTICLE VII CONDITIONS TO CLOSING ................................................................................ 26

Section 7.01     **Conditions to Obligations of All Parties.**................................................. 26

Section 7.02     **Conditions to Obligations of Buyer.**............................................................ 27

Section 7.03     **Conditions to Obligations of Seller.**.......................................................... 28

ARTICLE VIII TERMINATION ............................................................................................... 30

Section 8.01     **Termination.**................................................................................................. 30

Section 8.02     **Effect of Termination.**.................................................................................. 31

ARTICLE IX MISCELLANEOUS ............................................................................................ 31

Section 9.01     **Expenses.**..................................................................................................... 31

Section 9.02     **Notices.**........................................................................................................ 31

Section 9.03     **Interpretation.**............................................................................................. 32

Section 9.04     **Headings.**..................................................................................................... 32

Section 9.05     **Severability..**................................................................................................ 32

Section 9.06     **Entire Agreement.**....................................................................................... 33

Section 9.07     **Successors and Assigns.**............................................................................... 33

Section 9.08     **No Third Party Beneficiaries..**..................................................................... 33

Section 9.09     **Amendment and Modification; Waiver.** ...................................................... 33

Section 9.10     **Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.** .................. 33

Section 9.11     **Specific Performance.** ................................................................................. 34

Section 9.12     **Counterparts.**............................................................................................... 34

ARTICLE X BANKRUPTCY COURT MATTERS.................................................................... 35

Section 10.01    **Competing Transactions.**............................................................................ 35

Section 10.02    **Filings with Bankruptcy Court.**.................................................................. 35

Section 10.03    **Break-Up Fee.**.............................................................. **Error! Bookmark not defined.**

# ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "**Agreement**"), dated as of [DATE], is entered into between FPMI SOLUTIONS, INC., a Delaware corporation ("**Seller**") and [BUYER NAME], a [STATE OF ORGANIZATION] corporation ("**Buyer**").

## RECITALS

WHEREAS, Seller is engaged in the management and human resource consulting services for federal and commercial clients (the "**Business**");

WHEREAS, the Purchased Assets consist of general business assets as more fully described in Section 2.01 herein;

WHEREAS, Seller filed a voluntary Petition for reorganization under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Virginia, Alexandria Division (the "**Bankruptcy Court**"), under Case Number 16-12142 REM (the "**Bankruptcy Case**") and continue to own and operate the Property as debtors in possession of the bankruptcy estate (the "**Estate**");

WHEREAS, Seller wishes to sell and assign to Buyer, and Buyer wishes to purchase and assume from Seller, substantially all the assets and certain liabilities of the Business, subject to the terms and conditions set forth herein;

WHEREAS, the covenants and transactions contemplated herein are subject, in all respects, to the consideration of higher and better bids, if any, and approval of the Bankruptcy Court, after notice and a hearing.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

If not otherwise defined herein, the capitalized terms contained in this Agreement have the meanings specified or referred to in this Article I:

"**Affiliate**" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

**"Alternate Sale"** shall mean a transaction (regardless of the form thereof) with respect to the Property or any substantial portion thereof consummated by the Sellers in accordance with the bid process in the Bankruptcy Court other than a transaction with the Buyer; provided, however, that any such transaction consummated as a result of, related to, or arising from Buyer's breach or termination under this Agreement shall not constitute an Alternate Sale.

"**Bid Procedures**" shall mean the bid procedures governing the process by which the sale of the Property shall occur.

"**Bid Procedures Order**" shall mean, among other things, bid procedures, cure procedures, establishing a date for the Auction and scheduling a sale hearing.

"**Business Day**" means any day except Saturday, Sunday or any other day on which commercial banks located in Virginia are authorized or required by Law to be closed for business.

"**IRS Code**" means the Internal Revenue Code of 1986, as amended.

"**Contracts**" means all legally binding written contracts, leases, mortgages, licenses, instruments, notes, commitments, undertakings, indentures and other agreements.

"**Disclosure Schedules**" means the Disclosure Schedules delivered by Seller and Buyer concurrently with the execution and delivery of this Agreement.

"**Dollars or $**"  means the lawful currency of the United States.

"**Employee" or "Employees**" means those Persons employed by Seller who worked exclusively for the Business immediately prior to the Closing.

"**Encumbrance**" means any lien, pledge, mortgage, deed of trust, security interest, charge, claim, easement, encroachment or other similar encumbrance.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

"**Governmental Authority**" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any arbitrator, court or tribunal of competent jurisdiction.

"**Governmental Order**" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"**Intellectual Property**" means any and all of the following in any jurisdiction throughout the world: (a) trademarks and service marks, including all applications and registrations and the goodwill connected with the use of and symbolized by the foregoing; (b) copyrights, including all applications and registrations, and works of authorship, whether or not copyrightable; (c) trade secrets and confidential know-how; (d) patents and patent applications; (e) websites and internet domain name registrations; and (f) all other intellectual property and industrial property rights and assets, and all rights, interests and protections that are associated with, similar to, or required for the exercise of, any of the foregoing.

"**Intellectual Property Agreements**" means all licenses, sublicenses and other agreements by or through which other Persons grant Seller or Seller grants any other Persons any exclusive or non-exclusive rights or interests in or to any Intellectual Property that is used primarily in connection with the Business.

"**Intellectual Property Assets**" means all Intellectual Property that is owned by Seller and primarily used in connection with the Business, including the Intellectual Property Registrations set forth on Section 4.05 of the Disclosure Schedules.

"**Intellectual Property Registrations**" means all Intellectual Property Assets that are subject to any issuance, registration, application or other filing by, to or with any Governmental Authority or authorized private registrar in any jurisdiction, including registered trademarks, domain names, and copyrights, issued and reissued patents and pending applications for any of the foregoing.

"**Knowledge of Seller or Seller's Knowledge**" or any other similar knowledge qualification, means the actual knowledge of those persons listed on *Section 1.01(a)* of the Disclosure Schedules.

"**Law**" means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, other requirement or rule of law of any Governmental Authority.

"**Losses**" means actual out-of-pocket losses, damages, liabilities, costs or expenses, including reasonable attorneys' fees.

"**Material Adverse Effect**" means any event, occurrence, fact, condition or change, except for the Bankruptcy Case, that is materially adverse to (a) the business, results of operations, financial condition or assets of the Business, taken as a whole, or (b) the ability of Seller to consummate the transactions contemplated hereby.  However, the definition of Material Adverse Effect shall not include any event, occurrence, fact, condition or change, directly or indirectly, arising out of or attributable to: (i) general economic or political conditions; (ii) conditions generally affecting the industries in which the Business operates; (iii) any changes in financial, banking or securities markets in general, including any disruption thereof and any decline in the price of any security or any market index or any change in prevailing interest rates; (iv) acts of war (whether or not declared), armed hostilities or terrorism, or the escalation or worsening thereof; (v) any action required or permitted by this Agreement or any action taken

(or omitted to be taken) with the written consent of or at the written request of Buyer; (vi) any matter of which Buyer is aware on the date hereof; (vii) any changes in applicable Laws or accounting rules (including GAAP) [or the enforcement, implementation or interpretation thereof]; (viii) the announcement, pendency or completion of the transactions contemplated by this Agreement, including losses or threatened losses of employees, customers, suppliers, distributors or others having relationships with the Seller and the Business; (ix) any natural or man-made disaster or acts of God; or (x) any failure by the Business to meet any internal or published projections, forecasts or revenue or earnings predictions (provided that the underlying causes of such failures (subject to the other provisions of this definition) shall not be excluded).

"**Permits**" means all permits, licenses, franchises, approvals, authorizations and consents required to be obtained from Governmental Authorities.

"**Permitted Encumbrances**" means (a) liens for Taxes not yet due and payable or being contested in good faith by appropriate procedures; (b) mechanics', carriers', workmen's, repairmen's or other like liens arising or incurred in the ordinary course of business; (c) easements, rights of way, zoning ordinances and other similar encumbrances affecting real property; (d) liens arising under original purchase price conditional sales contracts and equipment leases with third parties entered into in the ordinary course of business; and (e) other imperfections of title or Encumbrances, if any, that have not had, and would not have, a Material Adverse Effect.

"**Person**" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"**Representative**" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

"**Taxes**" means all federal, state, local, foreign and other income, gross receipts, sales, use, production, ad valorem, transfer, franchise, registration, profits, license, lease, service, service use, withholding, payroll, employment, unemployment, estimated, excise, severance, environmental, stamp, occupation, premium, property (real or personal), real property gains, windfall profits, customs, duties or other taxes, fees, assessments or charges of any kind whatsoever, together with any interest, additions or penalties with respect thereto and any interest in respect of such additions or penalties.

"**Tax Return**" means any return, declaration, report, claim for refund, information return or statement or other document required to be filed with respect to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"**Transaction Documents**" means this Agreement, the Bill of Sale, the Assignment and Assumption Agreement, the Disclosure Schedule, and the other agreements, instruments and documents required to be delivered at the Closing.

**ARTICLE II**
**PURCHASE AND SALE**

**Section 2.01   Purchase and Sale of Assets.** Subject to the terms and conditions set forth herein, at the Closing, Seller shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase from Seller, all of Seller's right, title and interest in, to and under the following assets, properties and rights of Seller, to the extent that such assets, properties and rights exist as of the Closing Date and relate to the Business (collectively, the "**Purchased Assets**"), and as more fully set forth on the attached Disclosure Schedule:

(a)     after satisfaction in full of the secured debts owing to Bridge Bank, all deposit, checking, savings, and cash accounts of the Business, including but not limited to account numbers [__] maintained at Bridge Bank and Wells Fargo Bank;

(b)     all accounts or notes receivable of the Business, including, without limitation, intercompany receivables and accrued but unbilled accounts receivable as shown on the attached Disclosure Schedule through the date of Closing;

(c)     all short-term and long-term investments of the Business;

(d)     all inventory, finished goods, raw materials, work in progress, packaging, supplies, parts and other inventories of the Business ("**Inventory**");

(e)     all Contracts set forth on Section 2.01(e) of the Disclosure Schedules and the Intellectual Property Agreements set forth on  Section 2.01(e) of the Disclosure Schedules (collectively, the "**Assigned Contracts**");

(f)     all Intellectual Property Assets;

(g)     all furniture, fixtures, equipment, supplies and other tangible personal property of the Business listed on Section 2.01(g) of the Disclosure Schedules (the "**Tangible Personal Property**");

(h)     all Permits listed on Section 2.01(h) of the Disclosure Schedules, but only to the extent such Permits may be transferred under applicable Law;

(i)     all prepaid expenses, credits, advance payments, prepayments, security, deposits, security deposits, charges, sums and fees set forth on Section 2.01(i) of the Disclosure Schedules to the extent they are related to any Purchased Assets;

(j)     all of Seller's rights under warranties, indemnities and all similar rights against third parties to the extent related to any Purchased Assets;

(k)     originals, or where not available, copies, of all books and records, including books of account, ledgers and general, financial and accounting records, machinery and equipment maintenance files, customer lists, customer purchasing histories, price lists, distribution lists, supplier lists, production data, quality control

records and procedures, customer complaints and inquiry files, research and development files, records and data (including all correspondence with any Governmental Authority), sales material and records, strategic plans, internal financial statements and marketing and promotional surveys, material and research, that exclusively relate to the Business or the Purchased Assets, other than books and records set forth in Section 2.02 ("**Books and Records**"); and

(l)     all goodwill associated with any of the assets described in the foregoing clauses.

**Section 2.02   Excluded Assets.** Other than the Purchased Assets subject to Section 2.01, Buyer expressly understands and agrees that it is not purchasing or acquiring, and Seller is not selling or assigning, any other assets or properties of Seller, and all such other assets and properties shall be excluded from the Purchased Assets (the "**Excluded Assets**"). Excluded Assets include the following assets and properties of Seller:

(a)     all Intellectual Property other than the Intellectual Property Assets;

(b)     the corporate seals, organizational documents, minute books, stock books, Tax Returns, books of account or other records having to do with the corporate organization of Seller, all employee-related or employee benefit-related files or records, other than personnel files of Transferred Employees, and any other books and records which Seller is prohibited from disclosing or transferring to Buyer under applicable Law and is required by applicable Law to retain;

(c)     all insurance policies of Seller and all rights to applicable claims and proceeds thereunder;

(d)     subject to Section 6.04(d), all Benefit Plans and trusts or other assets attributable thereto;

(e)     all Tax assets (including duty and Tax refunds and prepayments) of Seller or any of its Affiliates;

(f)     all rights to any action, suit or claim of any nature available to or being pursued by Seller, whether arising by way of counterclaim or otherwise;

(g)     the assets, properties and rights specifically set forth in the Section 2.02 of the Disclosure Schedules; and

(h)     the rights which accrue or will accrue to Seller under the Transaction Documents.

**Section 2.03   Assumed Liabilities.** Subject to the terms and conditions set forth herein, Buyer shall assume and agree to pay, perform and discharge when due any and all liabilities and obligations of Seller arising out of or relating to the Business or the Purchased Assets on or after

the Closing, other than the Excluded Liabilities (collectively, the "**Assumed Liabilities**"), including, without limitation, the following:

        (a)      all liabilities and obligations arising under or relating to the Assigned Contracts;

        (b)      all Employee payroll liabilities or obligations due for the payroll period ending June 17, 2016, owed to Employees, taxing authorities, or other Persons or their Affiliates existing as of the date of Closing or arising thereafter, up to an aggregate maximum of $300,000;

        (c)      all Employee payroll liabilities or obligations accrued, but not due as of the date of Closing, up to an aggregate maximum of $300,000;

        (d)      except as specifically provided in Section 6.04, all liabilities and obligations of Buyer or its Affiliates relating to employee benefits, compensation or other arrangements with respect to any Transferred Employee arising on or after the Closing;

        (e)      all liabilities and obligations for (i) Taxes relating to the Business, the Purchased Assets or the Assumed Liabilities for any taxable period ending after the Closing Date and (ii) Taxes for which Buyer is liable pursuant to Section 6.11;

        (f)      all other liabilities and obligations arising out of or relating to Buyer's ownership or operation of the Business and the Purchased Assets on or after the Closing; and

        (g)      all liabilities and obligations of Seller set forth on Section 2.03 of the Disclosure Schedules.

**Section 2.04    Excluded Liabilities.** Buyer shall not assume and shall not be responsible to pay, perform or discharge any of the following liabilities or obligations of Seller (collectively, the "**Excluded Liabilities**"):

        (a)      any other trade accounts payable of Seller to third parties in connection with the Business that remain unpaid as of the Closing Date not otherwise identified in the Assumed Liabilities in Section 2.03;

        (b)      any liabilities or obligations arising out of or relating to Seller's ownership or operation of the Business and the Purchased Assets prior to the Closing Date, except those Assumed Liabilities described in Section 2.03;

        (c)      any liabilities or obligations relating to or arising out of the Excluded Assets;

        (d)      any liabilities or obligations for (i) Taxes relating to the Business, the Purchased Assets or the Assumed Liabilities for any taxable period ending on or prior to

the Closing Date and (ii) any other Taxes of Seller or any of its Affiliates (other than Taxes allocated to Buyer under Section 6.11) for any taxable period;

(e)        except as specifically provided in Section 6.04 and as specifically provided for in Section 2.03, any liabilities or obligations of Seller relating to or arising out of (i) the employment, or termination of employment, of any Employee prior to the Closing, or (ii) workers' compensation claims of any Employee which relate to events occurring prior to the Closing Date;

(f)        any liabilities or obligations of Seller arising or incurred in connection with the negotiation, preparation, investigation and performance of this Agreement, the other Transaction Documents and the transactions contemplated hereby and thereby, including, without limitation, fees and expenses of counsel, accountants, consultants, advisers and others;

(g)        any liabilities and obligations of Seller set forth on Section 2.04 of the Disclosure Schedules;

(h)        any obligations due to employment of Employees who are not Transferred Employees; and

(i)        any amounts in excess of the aggregate maximums identified in Sections 2.03(b) and (c).

**Section 2.05   Purchase Price.**

(a)        The aggregate purchase price for the Purchased Assets shall be [_____] dollars (**$_____**) (the "**Purchase Price**"), including the assumption of the Assumed Liabilities.  However, the Purchase Price will be reduced dollar for dollar by (i) all amounts payable by Buyer at Closing to Bridge Bank to fully extinguish the secured claims of Bridge Bank (the "**Secured Debt**"), and (ii) all liabilities related to Transferred Employees that will be paid directly by Buyer to Transferred Employees.  The claims against the Seller of the Transferred Employees will then be released. The Purchase Price shall be paid by one or more wire transfers of immediately available funds to an account or accounts designated by Seller, which designations shall be in writing by Seller to Buyer no later than one day prior to the Closing Date. Notwithstanding the foregoing, the portions of the Purchase Price identified on Section 2.05 of the Disclosure Schedule (each a "**Contract Purchase Price**"), which are specifically related to a Contract identified on Section 2.05 of the Disclosure Schedule (each a "**Government Contract**"), shall be paid at Closing.

(b)        Upon execution of this Agreement, Buyer shall deposit _____ dollars ($_____) as a refundable deposit ("Deposit") with Paul Sweeney.  The Deposit made payable to Paul Sweeney, Counsel for FPMI Solutions, Inc. ("Sweeney") and will be credited against the Purchase Price in the event Closing occurs hereunder and shall be held in escrow, in accordance with the terms and conditions of this Agreement, by Sweeney until said Closing or until the Deposit is required by the terms of this

Agreement to be applied or delivered elsewhere.  No interest will be earned on the Deposit.  The Deposit shall not be refunded if (i) Closing does not occur due to a breach or default by Buyer under any of the Transaction Documents, or (ii) a motion has been filed with the Bankruptcy Court to approve this Agreement.  Notwithstanding the foregoing, the Deposit shall be refunded if Seller consummates an Alternate Sale.

**Section 2.06   Allocation of Purchase Price.** Within thirty (30) days after the Closing Date, Seller shall deliver a schedule allocating the Purchase Price (including any Assumed Liabilities treated as consideration for the Purchased Assets for Tax purposes) (the "**Allocation Schedule**"). The Allocation Schedule shall be prepared in accordance with Section 1060 of the IRS Code. The Allocation Schedule shall be deemed final unless Buyer notifies Seller in writing that Buyer objects to one or more items reflected in the Allocation Schedule within ten (10) business days after delivery of the Allocation Schedule to Buyer. In the event of any such objection, Seller and Buyer shall negotiate in good faith to resolve such dispute; *provided, however*, that if Seller and Buyer are unable to resolve any dispute with respect to the Allocation Schedule within fifteen (15) business days after the delivery of the Allocation Schedule to Buyer, such dispute shall be resolved by an independent certified public accountant (the "**Tiebreaker**"). Such Tiebreaker shall be appointed by two certified public accountants, one of which is chosen by Buyer and the other by Seller. The fees and expenses of such Tiebreaker shall be borne equally by Seller and Buyer, and the fees by such certified public accountant shall be borne by the party appointing such accountant. Seller and Buyer agree to file their respective IRS Forms 8594 and all federal, state and local Tax Returns in accordance with the Allocation Schedule.

**Section 2.07   Non-assignable Assets.**

(a)      Notwithstanding anything to the contrary in this Agreement, and subject to the provisions of this Section 2.07, to the extent that the sale, assignment, transfer, conveyance or delivery, or attempted sale, assignment, transfer, conveyance or delivery, to Buyer of any Purchased Asset would result in a violation of applicable Law, or would require the consent, authorization, approval or waiver of a Person who is not a party to this Agreement or an Affiliate of a party to this Agreement (including any Governmental Authority), and such consent, authorization, approval or waiver shall not have been obtained prior to the Closing, this Agreement shall not constitute a sale, assignment, transfer, conveyance or delivery, or an attempted sale, assignment, transfer, conveyance or delivery, thereof; *provided, however,* that, subject to the satisfaction or waiver of the conditions contained in Article VII, the Closing shall occur notwithstanding the foregoing without any adjustment to the Purchase Price on account thereof. Following the Closing, Seller and Buyer shall use commercially reasonable efforts, and shall cooperate with each other, to obtain any such required consent, authorization, approval or waiver, or any release, substitution or amendment required to novate all liabilities and obligations under any and all Assigned Contracts or other liabilities that constitute Assumed Liabilities or to obtain in writing the unconditional release of all parties to such arrangements, so that, in any case, Buyer shall be solely responsible for such liabilities and obligations from and after the Closing Date; *provided, however,* that neither Seller nor Buyer shall be required to pay any consideration therefor. Once such consent, authorization, approval, waiver, release, substitution or amendment is obtained, Seller shall sell, assign, transfer, convey

and deliver to Buyer the relevant Purchased Asset to which such consent, authorization, approval, waiver, release, substitution or amendment relates for no additional consideration. Applicable sales, transfer and other similar Taxes in connection with such sale, assignment, transfer, conveyance or license shall be paid by Buyer in accordance with Section 6.11.

(b)     To the extent that any Purchased Asset and/or Assumed Liability cannot be transferred to Buyer following the Closing pursuant to this Section 2.07, Buyer and Seller shall use commercially reasonable efforts to enter into such arrangements (such as subleasing, sublicensing or subcontracting) to provide to the parties the economic and, to the extent permitted under applicable Law, operational equivalent of the transfer of such Purchased Asset and/or Assumed Liability to Buyer as of the Closing and the performance by Buyer of its obligations with respect thereto. Buyer shall, as agent or subcontractor for Seller pay, perform and discharge fully the liabilities and obligations of Seller thereunder from and after the Closing Date. To the extent permitted under applicable Law, Seller shall, at Buyer's expense, hold in trust for and pay to Buyer promptly upon receipt thereof, such Purchased Asset and all income, proceeds and other monies received by Seller to the extent related to such Purchased Asset in connection with the arrangements under this Section 2.07. Seller shall be permitted to set off against such amounts all direct costs associated with the retention and maintenance of such Purchased Assets upon advance reasonable written notice to Buyer. Notwithstanding anything herein to the contrary, the provisions of this Section 2.07 shall not apply to any consent or approval required under any antitrust, competition or trade regulation Law, which consent or approval shall be governed by Section 6.06.

## ARTICLE III
## CLOSING

**Section 3.01   Closing.** Subject to the terms and conditions of this Agreement, the consummation of the transactions contemplated by this Agreement (the "**Closing**") shall take place at the offices of Yumkas, Vidmar, Sweeney & Mulrenin, LLC, at 10211 Wincopin Circle, Suite 500, Columbia, MD 21044, at 3 pm Eastern US Time, on the third (3rd) Business Day after the Sale Order has been entered by the Bankruptcy Court in the Bankruptcy Case and all terms and conditions thereof shall be satisfied, or remotely by mail, e-mail and/or wire transfer, at such other time, date or place as Seller and Buyer may mutually agree upon in writing. The date on which the Closing is to occur is herein referred to as the "**Closing Date**".

**Section 3.02   Closing Deliverables.**

(a)     At the Closing, Seller shall deliver to Buyer the following:

(i)     a bill of sale in the form of Exhibit A hereto (the "**Bill of Sale**") and duly executed by Seller, transferring the tangible personal property included in the Purchased Assets to Buyer;

      (ii)     an assignment and assumption agreement in the form of **Exhibit B** hereto (the "**Assignment and Assumption Agreement**") and duly executed by Seller, for the assignment to and assumption by Buyer of the Purchased Assets and the Assumed Liabilities;

      (iii)    the Seller Closing Certificate;

      (iv)    the certificates of the Secretary or Assistant Secretary of Seller required by Section 7.02(e) and Section 7.02(f)

      (v)     the FIRPTA Certificate (as hereinafter defined)

      (vi)    such other customary instruments of transfer, assumption, filings or documents, in form and substance reasonably satisfactory to Buyer, as may be required to give effect to this Agreement.

(b)      At the Closing, Buyer shall deliver to Seller the following:

      (i)     the Purchase Price;

      (ii)     the Assignment and Assumption Agreement duly executed by Buyer;

      (iii)    the Buyer Closing Certificate;

      (iv)    a certificate of good standing in the state in which Buyer is organized on a form approved by Seller; and

      (v)     the resolutions of Buyer and certificates of the Secretary or Assistant Secretary of Buyer required by Section 7.03(e) and Section 7.03(f).

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLER

      Except as set forth in the Disclosure Schedules, Seller represents and warrants to Buyer that the statements contained in this Article IV are true and correct as of the date hereof.

      **Section 4.01   Organization and Qualification of Seller.** Seller is a corporation duly organized, validly existing and in good standing under the Laws of the state of Delaware and has all necessary authority to own, operate or lease the properties and assets now owned, operated or leased by it and to carry on the Business as currently conducted. Seller is duly licensed or qualified to do business and is in good standing in each jurisdiction in which the ownership of the Purchased Assets or the operation of the Business as currently conducted makes such licensing or qualification necessary, except where the failure to be so licensed, qualified or in good standing would not have a Material Adverse Effect.

**Section 4.02    Authority of Seller.** Except to the extent Seller requires approval from the Bankruptcy Court, Seller may enter into this Agreement and the other Transaction Documents to which Seller is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery by Seller of this Agreement and any other Transaction Document to which Seller is a party, the performance by Seller of its obligations hereunder and thereunder and the consummation by Seller of the transactions contemplated hereby and thereby have been duly authorized. This Agreement has been duly executed and delivered by Seller, and (assuming due authorization, execution and delivery by Buyer) with Bankruptcy Court approval this Agreement constitutes a legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity). When each other Transaction Document to which Seller is or will be a party has been  approved by the Bankruptcy Court and duly executed and delivered by Seller (assuming due authorization, execution and delivery by each other party thereto), such Transaction Document will constitute a legal and binding obligation of Seller enforceable against it in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

**Section 4.03    No Conflicts; Consents.** The execution, delivery and performance by Seller of this Agreement and the other Transaction Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) result in a violation or breach of any provision of the certificate of incorporation or by-laws of Seller; (b) result in a violation or breach of any provision of any Law or Governmental Order applicable to Seller, the Business or the Purchased Assets; or (c) except as set forth in Section 4.01 of the Disclosure Schedules, require the consent, notice or other action by any Person under, conflict with, result in a violation or breach of, constitute a default under or result in the acceleration of any Material Contract; except in the cases of clauses (b) and (c), where the violation, breach, conflict, default, acceleration or failure to give notice would not have a Material Adverse Effect. Except with respect to the Bankruptcy Court, no consent, approval, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority is required by or with respect to Seller in connection with the execution and delivery of this Agreement or any of the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby, except for such filings as may be required as set forth in Section 4.01 of the Disclosure Schedules and such consents, approvals, Permits, Governmental Orders, declarations, filings or notices which, in the aggregate, would not have a Material Adverse Effect.

**Section 4.04    Material Contracts.**

(a)        Section 4.02 of the Disclosure Schedules lists each of the following Contracts (x) by which any of the Purchased Assets are bound or affected or (y) to which Seller is a party or by which it is bound in connection with the Business or the Purchased Assets (together with all Intellectual Property Agreements listed in Section 4.05 of the Disclosure Schedules, collectively, the "**Material Contracts**"):

(i)     all Contracts involving aggregate consideration in excess of $[AMOUNT] or requiring performance by any party more than one year from the date hereof, which, in each case, cannot be cancelled without penalty or without more than [180/[NUMBER]] days' notice;

(ii)     all Contracts that relate to the sale of any of the Purchased Assets, other than in the ordinary course of business, for consideration in excess of $[AMOUNT];

(iii)     all Contracts that relate to the acquisition of any business, a material amount of stock or assets of any other Person or any real property (whether by merger, sale of stock, sale of assets or otherwise), in each case involving amounts in excess of $[AMOUNT];

(iv)     except for agreements relating to trade receivables, all Contracts relating to indebtedness (including, without limitation, guarantees), in each case having an outstanding principal amount in excess of $[AMOUNT];

(v)     all Contracts between or among the Seller on the one hand and any Affiliate of Seller on the other hand;

(vi)     all collective bargaining agreements or Contracts with any labor organization, union or association.

(b)     Except as set forth on Section 4.03 of the Disclosure Schedules, Seller is not in breach of, or default under, any Material Contract, except for such breaches or defaults that would not have a Material Adverse Effect.

**Section 4.05   Title to Tangible Personal Property.** Except as set forth in the Section 4.04 of the Disclosure Schedules, Seller has good and valid title to, or a valid leasehold interest in, all Tangible Personal Property included in the Purchased Assets, and subject to approval of the Bankruptcy Court will be free and clear of Encumbrances except for Permitted Encumbrances.

**Section 4.06   Intellectual Property.**

(a)     Section 4.05 of the Disclosure Schedules lists (i) all Intellectual Property Registrations and (ii) all Intellectual Property Agreements. Except as set forth in Section 4.05 of the Disclosure Schedules, or as would not have a Material Adverse Effect, Seller owns or has the right to use all Intellectual Property Assets and the Intellectual Property licensed to Seller under the Intellectual Property Agreements.

(b)     Except as set forth in Section 4.06 of the Disclosure Schedules, or as would not have a Material Adverse Effect, to Seller's Knowledge: (i) the conduct of the Business as currently conducted does not infringe, misappropriate, dilute or otherwise violate the Intellectual Property of any Person; and (ii) no Person is infringing, misappropriating or otherwise violating any Intellectual Property Assets.

Notwithstanding anything to the contrary in this Agreement, this Section 4.06(b) constitutes the sole representation and warranty of the Seller under this Agreement with respect to any actual or alleged infringement, misappropriation or other violation by Seller of any Intellectual Property of any other Person.

**Section 4.07    Legal Proceedings; Governmental Orders.**

(a)    Except as set forth in Section 4.07 of the Disclosure Schedules, there are no actions, suits, claims, investigations or other legal proceedings pending or, to Seller's Knowledge, threatened against or by Seller relating to or affecting the Business, the Purchased Assets, or the Assumed Liabilities which would be material to the Purchased Assets.

(b)    Except as set forth in Section 4.07 the Disclosure Schedules, there are no outstanding Governmental Orders and no unsatisfied judgments, penalties or awards against or affecting the Business or the Purchased Assets which would be material to the Purchased Assets.

**Section 4.08    Compliance With Laws; Permits.**

(a)    Except as set forth in Section 4.08 the Disclosure Schedules Seller is in compliance with all Laws applicable to the conduct of the Business as currently conducted or the ownership and use of the Purchased Assets, except where the failure to be in compliance would not be a Materia Adverse Effect.

(b)    All Permits required for Seller to conduct the Business as currently conducted or for the ownership and use of the Purchased Assets have been obtained by Seller and are valid and in full force and effect, except where the failure to obtain such Permits would not have a Material Adverse Effect.

**Section 4.09    Employee Benefit Matters.**

(a)    Section 4.09 of the Disclosure Schedules contains a list of each material benefit, retirement, employment, consulting, compensation, incentive, bonus, stock option, restricted stock, stock appreciation right, phantom equity, change in control, severance, vacation, paid time off, welfare and fringe-benefit agreement, plan, policy and program in effect and covering one or more Employees, former employees of the Business, current or former directors of the Business or the beneficiaries or dependents of any such Persons, and is maintained, sponsored, contributed to, or required to be contributed to by Seller, or under which Seller has any material liability for premiums or benefits (as listed on Section 4.09 of the Disclosure Schedules, each, a "**Benefit Plan**").

(b)    Except as set forth in Section 4.09 of the Disclosure Schedules, or as would not have a Material Adverse Effect, to Seller's Knowledge, each Benefit Plan and related trust complies with all applicable Laws (including ERISA [and/,] the Code [and applicable local Laws]). Each Benefit Plan that is intended to be qualified under Section

401(a) of the Code (a "**Qualified Benefit Plan**") has received a favorable determination letter from the Internal Revenue Service, or with respect to a prototype plan, can rely on an opinion letter from the Internal Revenue Service to the prototype plan sponsor, to the effect that such Qualified Benefit Plan is so qualified and that the plan and the trust related thereto are exempt from federal income Taxes under Sections 401(a) and 501(a), respectively, of the Code, and, to Seller's Knowledge, nothing has occurred that could reasonably be expected to cause the revocation of such determination letter from the Internal Revenue Service or the unavailability of reliance on such opinion letter from the Internal Revenue Service, as applicable. With respect to any Benefit Plan, to Seller's Knowledge, no event has occurred or is reasonably expected to occur that has resulted in or would subject Seller to a Tax under Section 4971 of the Code or the Purchased Assets to a lien under Section 430(k) of the Code.

(c)     Except as set forth in Section 4.09 of the Disclosure Schedules, no Benefit Plan: (i) is subject to the minimum funding standards of Section 302 of ERISA or Section 412 of the Code; or (ii) is a "multi-employer plan" (as defined in Section 3(37) of ERISA). Except as would not have a Material Adverse Effect, Seller has not: (A) withdrawn from any pension plan under circumstances resulting (or expected to result) in liability; or (B) engaged in any transaction which would give rise to a liability under Section 4069 or Section 4212(c) of ERISA.

(d)     Except as set forth in Section 4.09 of the Disclosure Schedules and other than as required under Section 4980B of the Code or other applicable Law, no Benefit Plan provides benefits or coverage in the nature of health, life or disability insurance following retirement or other termination of employment (other than death benefits when termination occurs upon death).

(e)     Except as set forth in Section 4.09 of the Disclosure Schedules, or as would not have a Material Adverse Effect, no Benefit Plan exists that could: (i) result in the payment to any Employee, director or consultant of the Business of any money or other property; or (ii) accelerate the vesting of or provide any additional rights or benefits (including funding of compensation or benefits through a trust or otherwise) to any Employee, director or consultant of the Business, in each case, as a result of the execution of this Agreement. Neither the execution of this Agreement nor the consummation of the transactions contemplated hereby will result in "excess parachute payments" within the meaning of Section 280G(b) of the Code.

(f)     The representations and warranties set forth in this Section 4.09 are the Seller's sole and exclusive representations and warranties regarding employee benefit matters.

**Section 4.10   Taxes.**

(a)     Except as set forth in Section 4.12 of the Disclosure Schedules, or as would not have a Material Adverse Effect, Seller has filed (taking into account any valid extensions) all material Tax Returns with respect to the Business required to be filed by Seller and has paid all Taxes shown thereon as owing. Seller is not currently the

beneficiary of any extension of time within which to file any material Tax Return other than extensions of time to file Tax Returns obtained in the ordinary course of business.

(b)     Seller is not a "foreign person" as that term is used in Treasury Regulations Section 1.1445-2.

(c)     The representations and warranties set forth in this Section 4.10 are Seller's sole and exclusive representations and warranties regarding Tax matters.

**Section 4.11   Brokers.** No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or any other Transaction Document based upon arrangements made by or on behalf of Seller.

**Section 4.12   No Other Representations and Warranties.** Except for the representations and warranties contained in this Article IV (including the related portions of the Disclosure Schedules), neither Seller nor any other Person has made or makes any other express or implied representation or warranty, either written or oral, on behalf of Seller, including any representation or warranty as to the accuracy or completeness of any information regarding the Business and the Purchased Assets furnished or made available to Buyer and its Representatives (including any information, documents or material delivered to Buyer, management presentations or in any other form in expectation of the transactions contemplated hereby) or as to the future revenue, profitability or success of the Business, or any representation or warranty arising from statute or otherwise in law.


# ARTICLE V
# REPRESENTATIONS AND WARRANTIES OF BUYER

Except as set forth in the Disclosure Schedules, Buyer represents and warrants to Seller that the statements contained in this Article V are true and correct as of the date hereof.

**Section 5.01   Organization and Authority of Buyer.** Buyer is a corporation duly organized, validly existing and in good standing under the Laws of the state of Delaware.

**Section 5.02   Authority of Buyer.** Buyer has all necessary corporate power and authority to enter into this Agreement and the other Transaction Documents to which Buyer is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery by Buyer of this Agreement and any other Transaction Document to which Buyer is a party, the performance by Buyer of its obligations hereunder and thereunder and the consummation by Buyer of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of Buyer. This Agreement has been duly executed and delivered by Buyer, and (assuming due authorization, execution and delivery by Seller) this Agreement constitutes a legal, valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally and by general principles of

equity (regardless of whether enforcement is sought in a proceeding at law or in equity). When each other Transaction Document to which Buyer is or will be a party has been duly executed and delivered by Buyer (assuming due authorization, execution and delivery by each other party thereto), such Transaction Document will constitute a legal and binding obligation of Buyer enforceable against it in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

**Section 5.03   No Conflicts; Consents.** The execution, delivery and performance by Buyer of this Agreement and the other Transaction Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) result in a violation or breach of any provision of the certificate of incorporation or by-laws of Buyer; (b) result in a violation or breach of any provision of any Law or Governmental Order applicable to Buyer; or (c) except as set forth in Section 5.03 of the Disclosure Schedules, require the consent, notice or other action by any Person under, conflict with, result in a violation or breach of, constitute a default under or result in the acceleration of any agreement to which Buyer is a party, except in the cases of clauses (b) and (c), where the violation, breach, conflict, default, acceleration or failure to give notice would not have a material adverse effect on Buyer's ability to consummate the transactions contemplated hereby. No consent, approval, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority is required by or with respect to Buyer in connection with the execution and delivery of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby, except as set forth in Section 5.03 of the Disclosure Schedules and such consents, approvals, Permits, Governmental Orders, declarations, filings or notices which would not have a material adverse effect on Buyer's ability to consummate the transactions contemplated hereby and thereby.

**Section 5.04   Brokers.** No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or any other Transaction Document based upon arrangements made by or on behalf of Buyer.

**Section 5.05   Sufficiency of Funds.** Buyer has sufficient cash on hand or other sources of immediately available funds to enable it to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement.

**Section 5.06   Solvency** Immediately after giving effect to the transactions contemplated hereby, Buyer shall be solvent and shall: (a) be able to pay its debts as they become due; (b) own property that has a fair saleable value greater than the amounts required to pay its debts (including a reasonable estimate of the amount of all contingent liabilities); and (c) have adequate capital to carry on its business. No transfer of property is being made and no obligation is being incurred in connection with the transactions contemplated hereby with the intent to hinder, delay or defraud either present or future creditors of Buyer or Seller. In connection with the transactions contemplated hereby, Buyer has not incurred, nor plans to incur, debts beyond its ability to pay as they become absolute and matured.

**Section 5.07   Legal Proceedings.** Except as set forth in Section 5.07 of the Disclosure Schedules, there are no actions, suits, claims, investigations or other legal proceedings pending or, to Buyer's knowledge, threatened against or by Buyer or any Affiliate of Buyer that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement.

**Section 5.08   Independent Investigation.** Buyer has conducted its own independent investigation, review and analysis of the Business and the Purchased Assets, and acknowledges that it has been provided adequate access to the personnel, properties, assets, premises, books and records, and other documents and data of Seller for such purpose. Buyer acknowledges and agrees that: (a) in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, Buyer has relied solely upon its own investigation and the express representations and warranties of Seller set forth in Article IV of this Agreement (including related portions of the Disclosure Schedules); and (b) neither Seller nor any other Person has made any representation or warranty as to Seller, the Business, the Purchased Assets or this Agreement, except as expressly set forth in Article IV of this Agreement (including the related portions of the Disclosure Schedules).

# ARTICLE VI
# COVENANTS

**Section 6.01   Conduct of Business Prior to the Closing.** From the date hereof until the Closing, subject to the authority of the Bankruptcy Court, Seller shall use reasonable commercial efforts to (a) conduct the Business in the ordinary course of business; and (b) use commercially reasonable efforts to maintain and preserve intact its current Business organization, operations and franchise and to preserve the rights, franchises, goodwill and relationships of its Employees, customers, lenders, suppliers, regulators and others having relationships with the Business.

**Section 6.02   Access to Information.** From the date hereof until the Closing, Seller shall (a) afford Buyer and its Representatives reasonable access to and the right to inspect all of the properties, assets, premises, Books and Records, Assigned Contracts and other documents and data related to the Business; (b) furnish Buyer and its Representatives with such financial, operating and other data and information related to the Business as Buyer or any of its Representatives may reasonably request; and (c) instruct the Representatives of Seller to cooperate with Buyer in its investigation of the Business; *provided, however,* that any such investigation shall be conducted during normal business hours upon reasonable advance notice to Seller, under the supervision of Seller's personnel and in such a manner as not to interfere with the conduct of the Business or any other businesses of Seller. All requests by Buyer for access pursuant to this Section 6.02 shall be submitted or directed exclusively to Mark McLindon, Chief Executive Officer, or such other individuals as Seller may designate in writing from time to time. Notwithstanding anything to the contrary in this Agreement, Seller shall not be required to disclose any information to Buyer if such disclosure would, in Seller's sole discretion: (x) cause significant competitive harm to Seller and its businesses, including the Business, if the transactions contemplated by this Agreement are not consummated; (y) jeopardize any attorney-client or other privilege; or (z) contravene any applicable Law, fiduciary duty or binding agreement entered into prior to the date of this Agreement. Prior to the Closing, without the prior

written consent of Seller, which may be withheld for any reason, Buyer shall not contact any suppliers to, or customers of, the Business.

Section 6.03   **Supplement to Disclosure Schedules.** From time to time prior to the Closing, Seller shall have the right (but not the obligation) to supplement or amend the Disclosure Schedules hereto with respect to any matter hereafter arising or of which it becomes aware after the date hereof (each a "**Schedule Supplement**"). Buyer has the right to terminate this Agreement within five (5) Business Days of its receipt of such Schedule Supplement, however if Buyer does not do so within such timeframe, then Buyer shall be deemed to have irrevocably waived any right to terminate this Agreement with respect to such matter.

Section 6.04   **Employees and Employee Benefits.**

(a)   Buyer shall, or shall cause an Affiliate of Buyer to, offer employment effective on the Closing Date, to those certain Employees listed on Section 6.01 of the Disclosure Schedule (the Employees who accept such employment and commence employment on the Closing Date, the "**Transferred Employees**").

(b)   During the period commencing on the Closing Date and ending on the date which is twelve (12) months from the Closing (or if earlier, the date of the Transferred Employee's termination of employment with Buyer or an Affiliate of Buyer), Buyer shall, or shall cause an Affiliate of Buyer to, in its commercially reasonable direction, provide each Transferred Employee with: (i) base salary or hourly wages which are comparable to the base salary or hourly wages of similarly situated employees in the industry; (ii) target bonus opportunities (excluding equity-based compensation), if any, which are based on Buyer' customary business practices, plans, and polices; and (iii) severance benefits, which are based on Buyer' customary business practices, plans, and polices.

(c)   With respect to any employee benefit plan maintained by Buyer or an Affiliate of Buyer (collectively, "**Buyer Benefit Plans**") for the benefit of any Transferred Employee, effective as of the Closing, Buyer shall, or shall cause its Affiliate to, in its commercially reasonable direction, recognize the service of the Transferred Employees with Seller, as if such service were with Buyer, for vesting, eligibility and accrual purposes; *provided, however,* such service shall not be recognized to the extent that (x) such recognition would result in a duplication of benefits; (y) such service was not recognized under the corresponding Benefit Plan; or (z) such Transferred Employees are not eligible for the Buyer Benefit Plans.

(d)   Effective as soon as practicable following the Closing Date, Seller, or any applicable Affiliate, shall effect a transfer of assets and liabilities (including outstanding loans) from the defined contribution retirement plan that it maintains to the defined contribution retirement plan maintained by Buyer, with respect to the Transferred Employees, in connection with the transactions contemplated by this Agreement, provided the defined contribution retirement plan maintained by Buyer can accept such a

transfer. Any such transfer shall be in an amount sufficient to satisfy Section 414(l) of the IRS Code.

(e)     Effective as of the Closing, the Transferred Employees shall cease active participation in the Benefit Plans. Seller shall remain liable for all eligible claims for benefits under the Benefit Plans that are incurred by the Employees prior to the Closing Date. For purposes of this Agreement, the following claims shall be deemed to be incurred as follows: (i) life, accidental death and dismemberment, short-term disability, and workers' compensation insurance benefits, on the event giving rise to such benefits; (ii) medical, vision, dental, and prescription drug benefits, on the date the applicable services, materials or supplies were provided; and (iii) long-term disability benefits, on the eligibility date determined by the long-term disability insurance carrier for the plan in which the applicable Employee participates.

(f)     Buyer and Seller intend that the transactions contemplated by this Agreement should not constitute a separation, termination or severance of employment of any Employee who accepts an employment offer by Buyer that is consistent with the requirements of Section 6.04(b), including for purposes of any Benefit Plan that provides for separation, termination or severance benefits, and that each such Employee will have continuous employment immediately before and immediately after the Closing. Buyer shall be liable and hold the Seller harmless for: (i) any statutory, common law, contractual or other severance with respect to any Employee, other than an Employee who has received an offer of employment by Buyer on terms and conditions consistent with Section 6.04(b) hereof and declines such offer; and (ii) any claims relating to the employment of any Transferred Employee arising in connection with or following the Closing.

(g)     This Section 6.04 shall be binding upon and inure solely to the benefit of each of the parties to this Agreement, and nothing in this Section 6.04, express or implied, shall confer upon any other Person any rights or remedies of any nature whatsoever under or by reason of this Section 6.04. Nothing contained herein, express or implied, shall be construed to establish, amend or modify any benefit plan, program, agreement or arrangement. The parties hereto acknowledge and agree that the terms set forth in this Section 6.04 shall not create any right in any Transferred Employee or any other Person to any continued employment with Buyer or any of its Affiliates or compensation or benefits of any nature or kind whatsoever.

**Section 6.05**   Intentionally omitted.

**Section 6.06   Governmental Approvals and Consents.**

(a)     Each party hereto shall, as promptly as possible, use its reasonable best efforts to obtain, or cause to be obtained, all consents, authorizations, orders and approvals from all Governmental Authorities that may be or become necessary for its execution and delivery of this Agreement and the performance of its obligations pursuant to this Agreement and the other Transaction Documents. Each party shall cooperate fully

with the other party and its Affiliates in promptly seeking to obtain all such consents, authorizations, orders and approvals. The parties hereto shall not willfully take any action that will have the effect of delaying, impairing or impeding the receipt of any required consents, authorizations, orders and approvals.

(b)    Without limiting the generality of the Buyer's undertakings pursuant to this Section 6.06, Buyer agrees to use its reasonable best efforts and to take any and all steps necessary to avoid or eliminate each and every impediment under any antitrust, competition or trade regulation Law that may be asserted by any Governmental Authority or any other party so as to enable the parties hereto to close the transactions contemplated by this Agreement as promptly as possible, including proposing, negotiating, committing to and effecting, by consent decree, hold separate orders, or otherwise, the sale, divestiture or disposition of any of its assets, properties or businesses or of the assets, properties or businesses to be acquired by it pursuant to this Agreement as are required to be divested in order to avoid the entry of, or to effect the dissolution of, any injunction, temporary restraining order or other order in any suit or proceeding, which would otherwise have the effect of materially delaying or preventing the consummation of the transactions contemplated by this Agreement. In addition, Buyer shall use its reasonable best efforts to defend through litigation on the merits any claim asserted in court by any party in order to avoid entry of, or to have vacated or terminated, any Governmental Order (whether temporary, preliminary or permanent) that would prevent the consummation of the Closing.

(c)    Seller and Buyer shall use commercially reasonable efforts to give all notices to, and obtain all consents from, all third parties that are described in the Sections 4.01 and 5.0# of the Disclosure Schedules where Seller and/or Buyer would be obligated to provide notice to, or obtain consent from; *provided, however*, that Seller shall not be obligated to pay any consideration therefor to any third party from whom consent or approval is requested.

**Section 6.07    Books and Records.**

(a)    In order to facilitate the resolution of any claims made against or incurred by Seller prior to the Closing, or for any other reasonable purpose, for a period of seven (7) years after the Closing, Buyer shall:

(i)    retain the Books and Records (including personnel files) relating to periods prior to the Closing in a manner reasonably consistent with the prior practices of Seller; and

(ii)    upon reasonable notice, afford the Seller's Representatives reasonable access (including the right to make, at Seller's expense, photocopies), during normal business hours, to such Books and Records.

(b)    In order to facilitate the resolution of any claims made by or against or incurred by Buyer after the Closing, or for any other reasonable purpose, for a period of three (3) years after the Closing, Seller shall:

(i)      retain the books and records (including personnel files) of Seller which relate to the Business and its operations for periods prior to the Closing; and

(ii)     upon reasonable notice, afford the Buyer's Representatives reasonable access (including the right to make, at Buyer's expense, photocopies), during normal business hours, to such books and records.

(c)      Neither Buyer nor Seller shall be obligated to provide the other party with access to any books or records (including personnel files) pursuant to this Section 6.07 where such access would violate any Law.

**Section 6.08    Closing Conditions.** From the date hereof until the Closing, each party hereto shall use commercially reasonable efforts to take such actions as are necessary to expeditiously satisfy the closing conditions set forth in Article VII hereof.

**Section 6.09    Public Announcements.** Unless otherwise required by applicable Law, including, but not limited to the obligations under the Bankruptcy Code (based upon the reasonable advice of counsel), no party to this Agreement shall make any public announcements in respect of this Agreement or the transactions contemplated hereby or otherwise communicate with any news media without the prior written consent of the other party (which consent shall not be unreasonably withheld or delayed), and the parties shall cooperate as to the timing and contents of any such announcement.

**Section 6.10    Intentionally omitted.**

**Section 6.11    Transfer Taxes.** All transfer, documentary, sales, use, stamp, registration, value added and other such Taxes and fees (including any penalties and interest) incurred in connection with this Agreement and the other Transaction Documents (including any real property transfer Tax and any other similar Tax) shall be borne and paid by Buyer when due. Buyer shall, at its own expense, timely file any Tax Return or other document with respect to such Taxes or fees (and Seller shall cooperate with respect thereto as necessary).

**Section 6.12    Further Assurances.** Following the Closing, each of the parties hereto shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement and the other Transaction Documents.

**ARTICLE VII**
**CONDITIONS TO CLOSING**

**Section 7.01    Conditions to Obligations of All Parties.** The obligations of each party to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions:

(a)     No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Governmental Order which is in effect and has the effect of making the transactions contemplated by this Agreement illegal, otherwise restraining or prohibiting consummation of such transactions or causing any of the transactions contemplated hereunder to be rescinded following completion thereof.

(b)     Seller shall have received all consents, authorizations, orders and approvals from the Persons referred to in Section 4.03 and Buyer shall have received all consents, authorizations, orders and approvals from the Governmental Authorities referred to in Section 5.03, in each case, in form and substance reasonably satisfactory to Buyer and Seller, and no such consent, authorization, order and approval shall have been revoked.

(c)     The Sale Order shall have been entered by the Bankruptcy Court in the Bankruptcy Case and all terms and conditions thereof shall be satisfied.

(d)     No litigation or other court action shall have been commenced by a third-party seeking to obtain an injunction or other relief from such court to enjoin the consummation of the transactions described in this Agreement, and no preliminary or permanent injunction or other order, decree or ruling shall have been issued by a court of competent jurisdiction or by any governmental authority, would make illegal or invalid or otherwise prevent the consummation of the transactions described in this Agreement.

**Section 7.02   Conditions to Obligations of Buyer.** The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Buyer's waiver, at or prior to the Closing, of each of the following conditions:

(a)     The representations and warranties of Seller contained in Article IV shall be true and correct in all respects as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, which shall be true and correct in all respects as of that specified date), except where the failure of such representations and warranties to be true and correct would not have a Material Adverse Effect.

(b)     Seller shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement and each of the other Transaction Documents to be performed or complied with by it prior to or on the Closing Date.

(c)     Seller shall have delivered to Buyer duly executed counterparts to the Transaction Documents (other than this Agreement) and such other documents and deliveries set forth in Section 3.02(a).

(d)     Buyer shall have received a certificate, dated the Closing Date and signed by a duly authorized officer of Seller, that each of the conditions set forth in Section 7.02(a) and Section 7.02(b) have been satisfied (the "**Seller Closing Certificate**").

(e)     Buyer shall have received a certificate of the Secretary or an Assistant Secretary (or equivalent officer) of Seller certifying the names and signatures of the officers of Seller authorized to sign this Agreement, the Transaction Documents and the other documents to be delivered hereunder and thereunder.

(f)     The Sale Order shall have been entered by the Bankruptcy Court in the Bankruptcy Case and all terms and conditions thereof shall be satisfied.

(g)     Buyer shall have received a certificate pursuant to Treasury Regulations Section 1.1445-2(b) substantially in the form of Exhibit C (the "**FIRPTA Certificate**") that Seller is not a foreign person within the meaning of Section 1445 of the Code duly executed by Seller.

**Section 7.03   Conditions to Obligations of Seller.** The obligations of Seller to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Seller's waiver, at or prior to the Closing, of each of the following conditions:

(a)     The representations and warranties of Buyer contained in Article V shall be true and correct in all respects as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, which shall be true and correct in all respects as of that specified date), except where the failure of such representations and warranties to be true and correct would not have a material adverse effect on Buyer's ability to consummate the transactions contemplated hereby.

(b)     Buyer shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement and each of the other Transaction Documents to be performed or complied with by it prior to or on the Closing Date.

(c)     Buyer shall have delivered to Seller the Purchase Price, duly executed counterparts to the Transaction Documents (other than this Agreement) and such other documents and deliveries set forth in Section 3.02(b).

(d)     Seller shall have received a certificate, dated the Closing Date and signed by a duly authorized officer of Buyer, that each of the conditions set forth in Section 7.03(a) and Section 7.03(b) have been satisfied (the "**Buyer Closing Certificate**").

(e)     Seller shall have received resolutions of the Buyer and a certificate of the Secretary or an Assistant Secretary (or equivalent officer) of Buyer certifying that attached thereto are true and complete copies of all resolutions adopted by the board of directors of Buyer authorizing the execution, delivery and performance of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby, and that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the transactions contemplated hereby and thereby.

(f)     Seller shall have received a certificate of the Secretary or an Assistant Secretary (or equivalent officer) of Buyer certifying the names and signatures of the officers of Buyer authorized to sign this Agreement, the Transaction Documents and the other documents to be delivered hereunder and thereunder.

(g)     The Sale Order shall have been entered by the Bankruptcy Court in the Bankruptcy Case, reflecting that Buyer has submitted the highest and best offer for the purchase of the Assets, and all terms and conditions thereof shall be satisfied.

## ARTICLE VIII
## INDEMNIFICATION

**Section 8.01   Survival.** Subject to the limitations and other provisions of this Agreement, the representations and warranties contained herein shall survive the Closing and shall remain in full force and effect until the date that is twelve (12) months from the Closing Date. None of the covenants or other agreements contained in this Agreement shall survive the Closing Date other than those which by their terms contemplate performance after the Closing Date, and each such surviving covenant and agreement shall survive the Closing for the period contemplated by its terms. Notwithstanding the foregoing, any claims asserted in good faith with reasonable specificity (to the extent known at such time) and in writing by notice from the non-breaching party to the breaching party prior to the expiration date of the applicable survival period shall not thereafter be barred by the expiration of such survival period and such claims shall survive until finally resolved.

**Section 8.02   Indemnification By Seller.** Subject to the other terms and conditions of this Article VIII, Seller shall indemnify Buyer against, and shall hold Buyer harmless from and against, any and all Losses incurred or sustained by, or imposed upon, Buyer based upon, arising out of, with respect to or by reason of:

(a)     any inaccuracy in or breach of any of the representations or warranties of Seller contained in this Agreement;

(b)     any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Seller pursuant to this Agreement; or

(c)     any Excluded Asset or any Excluded Liability.

**Section 8.03   Indemnification By Buyer.** Subject to the other terms and conditions of this Article VIII, Buyer shall indemnify Seller against, and shall hold Seller harmless from and against, any and all Losses incurred or sustained by, or imposed upon, Seller based upon, arising out of, with respect to or by reason of:

(a)     any inaccuracy in or breach of any of the representations or warranties of Buyer contained in this Agreement;

(b)      any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Buyer pursuant to this Agreement; or

(c)      any Assumed Liability.

**Section 8.04    Indemnification Procedures.**

(a)      Third Party Claims. If Buyer or Seller (as the case may be, the "**Indemnified Party**") receives notice of the assertion or commencement of any action, suit, claim or other legal proceeding made or brought by any Person who is not a party to this Agreement or an Affiliate of a party to this Agreement or a Representative of the foregoing (a "**Third Party Claim**") against such Indemnified Party with respect to which the Seller or Buyer (as the case may be, the "**Indemnifying Party**") is obligated to provide indemnification under this Agreement, the Indemnified Party shall give the Indemnifying Party prompt written notice thereof. Seller and Buyer shall cooperate with each other in all reasonable respects in connection with the defense of any Third Party Claim, including making available records relating to such Third Party Claim and furnishing, without expense (other than reimbursement of actual out-of-pocket expenses) to the defending party, management employees of the non-defending party as may be reasonably necessary for the preparation of the defense of such Third Party Claim.

**ARTICLE IX
TERMINATION**

**Section 9.01    Termination.** This Agreement may be terminated at any time prior to the Closing:

(a)      by the mutual written consent of Seller and Buyer;

(b)      by Buyer by written notice to Seller if:

(i)      Buyer is not then in material breach of any provision of this Agreement and there has been a material breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Seller pursuant to this Agreement that would give rise to the failure of any of the conditions specified in Article VII and such breach, inaccuracy or failure cannot be cured by Seller by Closing (the "**Drop Dead Date**"); or

(ii)      any of the conditions set forth in Section 7.01 or Section 7.02 shall not have been cured by the Drop Dead Date, unless such failure shall be due to the failure of Buyer to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing;

(c)      by Seller by written notice to Buyer if:

(i)     Buyer has not submitted the highest and best offer for purchase of the Purchased Assets as approved by the Bankruptcy Court;

(ii)     Seller is not then in material breach of any provision of this Agreement and there has been a material breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Buyer pursuant to this Agreement that would give rise to the failure of any of the conditions specified in Article VII and such breach, inaccuracy or failure cannot be cured by Buyer by the Drop Dead Date; or

(iii)     any of the conditions set forth in Section 7.01 or Section 7.03 shall not have been fulfilled by the Drop Dead Date, unless such failure shall be due to the failure of Seller to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing; or

**Section 9.02   Effect of Termination.** In the event of the termination of this Agreement in accordance with this Article, this Agreement shall forthwith become void and there shall be no liability on the part of any party hereto except:

(a)     as set forth in this Article IX and Article X hereof; and

(b)     that nothing herein shall relieve any party hereto from liability for any intentional breach of any provision hereof.


# ARTICLE X
# MISCELLANEOUS

**Section 10.01   Expenses.** Except as otherwise expressly provided herein (including Section 6.11 hereof), all costs and expenses, including, without limitation, fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses, whether or not the Closing shall have occurred.

**Section 10.02   Notices.** All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; or (d) on the third (3rd) day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 10.02):

If to Seller:                           P.O. Box _____
                                        Facsimile:       [FAX NUMBER]
                                        E-mail: mmclindon@fpmi.com
                                        Attention:       Mark McLindon, CEO


with a copy to:                         Yumkas, Vidmar, Sweeney & Mulrenin, LLC
                                        Facsimile:       (410) 571-2798
                                        E-mail: psweeney@yvslaw.com
                                        Attention:       Paul Sweeney, Esq.


If to Buyer:                            [BUYER ADDRESS]
                                        Facsimile:
                                        E-mail:
                                        Attention:


with a copy to:
                                        Facsimile:
                                        E-mail:
                                        Attention:


**Section 10.03  Interpretation.** For purposes of this Agreement, (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole. Unless the context otherwise requires, references herein: (x) to Articles, Sections, Disclosure Schedules and Exhibits mean the Articles and Sections of, and Disclosure Schedules and Exhibits attached to, this Agreement; (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The Disclosure Schedules and Exhibits referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.  All references to the singular shall be deemed to include the plural, as the case may be, and vice versa.

**Section 10.04  Headings.** The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

**Section 10.05  Severability.** If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this

Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

**Section 10.06  Entire Agreement.** This Agreement and the other Transaction Documents constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous representations, warranties, understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement and those in the other Transaction Documents, the Exhibits and Disclosure Schedules (other than an exception expressly set forth as such in the Disclosure Schedules), the statements in the body of this Agreement will control.

**Section 10.07  Successors and Assigns.** This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. Neither party may assign its rights or obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed. No assignment shall relieve the assigning party of any of its obligations hereunder.

**Section 10.08  No Third Party Beneficiaries.** This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

**Section 10.09  Amendment and Modification; Waiver.** This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

**Section 10.10  Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.**

(a)    This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware except to the extent that the Federal Bankruptcy Law governs without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction).

(b)    ANY LEGAL SUIT, ACTION OR PROCEEDING ARISING OUT OF OR BASED UPON THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR

THEREBY MAY BE INSTITUTED IN THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA, OR THE UNITED STATES BANKRUPTCY COURT FOR THE EASTERN DISTRICT OF VIRGINIA, ALEXANDRIA DIVISION, IN EACH CASE, AND EACH PARTY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS IN ANY SUCH SUIT, ACTION OR PROCEEDING. SERVICE OF PROCESS, SUMMONS, NOTICE OR OTHER DOCUMENT BY MAIL TO SUCH PARTY'S ADDRESS SET FORTH HEREIN SHALL BE EFFECTIVE SERVICE OF PROCESS FOR ANY SUIT, ACTION OR OTHER PROCEEDING BROUGHT IN ANY SUCH COURT. THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY OBJECTION TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR ANY PROCEEDING IN SUCH COURTS AND IRREVOCABLY WAIVE AND AGREE NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(c)    EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT OR THE OTHER TRANSACTION DOCUMENTS IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH PARTY TO THIS AGREEMENT CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (B) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (D) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.10(c).

**Section 10.11  Specific Performance.** The parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity.

**Section 10.12  Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

## ARTICLE XI
## BANKRUPTCY COURT MATTERS

**Section 11.01  Competing Transactions.**    This Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller of higher or better competing bids (each, a "**Competing Bid**").  Until the transactions contemplated by this Agreement are consummated, Seller is permitted to cause its representatives and affiliates to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any person in connection with any sale or disposition of the Property.  In addition, Seller shall have the responsibility and obligation to respond to any inquiries or offers to purchase all or any part of the Purchased Assets and perform any and all other acts related thereto which are required under the Bankruptcy Code, the or other applicable Law, including, supplying information relating to the Purchased Assets and the assets of Seller to prospective purchasers.

**Section 11.02  Filings with Bankruptcy Court.**

**(a)**      Within three (3) Business Days following the execution of this Agreement, Seller shall file a motion, and related notice of hearing, pursuant to the Bankruptcy Code, including, but not limited to 11 U.S.C. §§ 363 and 365 (the "**Sale Motion**"), requesting entry of the Sale Order approving this Agreement and the sale and assignments and related transactions contemplated hereby.  The notice of the hearing to consider the Sale Motion (the "**Hearing**") shall be served on all parties required by the Bankruptcy Code (the "**Hearing Notice**").  At the Hearing, Seller shall offer testimony (whether live, documentary, or by proffer) to establish that the transactions proposed herein are fair and equitable, are in the best interests of their creditors and the bankruptcy estates, and that the sale is a valid and proper exercise of the Seller's business judgment.

**(b)**      Buyer agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" purchaser under § 363(m) of the Bankruptcy Code.

*[signature page follows]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

ATTEST:                                      FPMI SOLUTIONS, INC.


_____      By_____
Name:                                        Name:

                                             Title:


ATTEST:                                      [BUYER NAME]


_____      By_____
Name:                                        Name:

                                             Title:

# EXHIBIT A

# FORM OF BILL OF SALE

For good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, FPMI Solutions, Inc., a Delaware corporation ("**Seller**"), does hereby grant, bargain, transfer, sell, assign, convey and deliver to [BUYER NAME], a [STATE OF ORGANIZATION] [TYPE OF ENTITY] ("**Buyer**"), all of its right, title and interest in and to the Purchased Assets, as such term is defined in that certain Asset Purchase Agreement, dated as of [DATE] (the "**Purchase Agreement**"), by and between Seller and Buyer, to have and to hold the same unto Buyer, its successors and assigns, forever.

Buyer acknowledges that Seller makes no representation or warranty with respect to the assets being conveyed hereby except as specifically set forth in the Purchase Agreement.

Seller for itself, its successors and assigns, hereby covenants and agrees that, at any time and from time to time upon the written request of Buyer, Seller will do, execute, acknowledge and deliver or cause to be done, executed, acknowledged and delivered, all such further acts, deeds, assignments, transfers, conveyances, powers of attorney and assurances as may be reasonably required by Buyer in order to assign, transfer, set over, convey, assure and confirm unto and vest in Buyer, its successors and assigns, title to the assets sold, conveyed and transferred by this Bill of Sale.

IN WITNESS WHEREOF, Seller has duly executed this Bill of Sale as of [DATE].

FPMI SOLUTIONS, INC.

By_____

Name:

Title:

# EXHIBIT B

## FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT WITH NOVATION

# EXHIBIT B
# to
# Asset Purchase
# Agreement

# ASSIGNMENT AND ASSUMPTION AGREEMENT WITH NOVATION

This Assignment and Assumption Agreement with Novation ("**Agreement**") dated as of [DATE] ("**Effective Date**"), is entered into by and among FPMI Solutions, Inc., a Delaware Corporation, with offices located at [SELLER'S ADDRESS] ("**Assigning Party**"), and [ASSUMING PARTY NAME], a [STATE OF ORGANIZATION] [TYPE OF LEGAL ENTITY], with offices located at [ADDRESS] ("**Assuming Party**").

WHEREAS, Seller filed a voluntary Petition for reorganization under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Virginia, Alexandria Division (the "**Bankruptcy Court**"), under Case Number 16-12142 REM (the "**Bankruptcy Case**") and continue to own and operate the Property as debtors in possession of the bankruptcy estate (the "**Estate**");

WHEREAS, Assigning Party and Assuming Party have executed that certain Asset Purchase Agreement, dated _____, 2016 (the "APA") subject to the approval of the Bankruptcy Court where Assuming Party purchased all of the assets of Assigning Party and the APA contemplated an assignment of certain contracts, some of which are government contracts which are subject to governmental approval of a novation to the Assuming Party (as further described therein);

WHEREAS, Assigning Party desires to assign to Assuming Party all of its rights and delegate to Assuming Party all of its obligations under certain contracts as described on Schedule 1 attached hereto (collectively "**Assigned Contracts**");

WHEREAS, Assuming Party desires to accept such assignment of rights and delegation of obligations under the Assigned Contracts;

WHEREAS, Remaining Party desires to release Assigning Party from its obligations under the Assigned Contracts and substitute Assuming Party as a party to the Assigned Contracts in Assigning Party's place.

NOW, THEREFORE, in consideration of the mutual covenants, terms and conditions set out herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.      Assignment and Assumption.

    1.1      Assignment. Assigning Party irrevocably sells, assigns, grants, conveys and transfers to Assuming Party all of Assigning Party's right, title and interest in and to the Assigned Contracts.

    1.2      Assumption. Assuming Party unconditionally accepts such assignment and assumes all of Assigning Party's duties, liabilities and obligations under the Assigned Contracts, and agrees to pay, perform and discharge, as and when due, all of the obligations of Assigned Party under the Assigned Contracts accruing on and after the Effective Date.

2.      <u>Novation</u>.  The Assigning Party and the Assuming Party hereby agree to execute and to seek full execution of Schedule 2 of this Agreement, including by Remaining Party (as defined therein).

3.      <u>Representations and Warranties</u>.

3.1      <u>Assigning Party's Representations and Warranties</u>. Assigning Party represents and warrants as follows:

(a)      It is duly organized, validly existing and in good standing under the laws of Delaware.

(b)      It is qualified and licensed to do business and in good standing in every jurisdiction where such qualification and licensing is required.

(c)      Subject to the authority of the Bankruptcy Court and any rights of federal government agencies which are applicable to the novation process, if any, the Assigning Party has the full right, corporate power and authority to enter into this Agreement and to perform its obligations hereunder.

(d)      It has taken all necessary corporate action to authorize the execution of this Agreement by its representative whose signature is set out at the end hereof.

(e)      When executed and delivered by it, and subject to approval of the Bankruptcy Court, this Agreement will constitute the legal, valid and binding obligation of Assigning Party, enforceable against it in accordance with its terms and not subject to defenses.

(f)      Subject to approval and authorization of the Bankruptcy Court, it is the sole legal and beneficial owner of the all the rights under the Assigned Contracts on the Effective Date, free and clear of any lien, security interest, charge or encumbrance.

(g)      The Assigned Contract has not been amended or modified as of the Effective Date.

(h)      The Assigned Contracts are in full force and effect on the Effective Date.

3.2      <u>Assuming Party's Representations and Warranties</u>. Assuming Party represents and warrants as follows:

(a)      It is duly organized, validly existing and in good standing under the laws of Delaware.

(b)      It is qualified and licensed to do business and in good standing in every jurisdiction where such qualification and licensing is required.

(c)     It has the full right, corporate power and authority to enter into this Agreement and to perform its obligations hereunder.

(d)     It has taken all necessary corporate action to authorize the execution of this Agreement by its representative whose signature is set out at the end hereof.

(e)     When executed and delivered by it, this Agreement will constitute the legal, valid and binding obligation of Assuming Party, enforceable against it in accordance with its terms.

4.   <u>Indemnification</u>.

4.1   <u>Mutual Indemnification</u>. Subject to the terms and conditions set out in Section 4.2, each Party (as "**Indemnifying Party**") shall indemnify and defend the other Party and its officers, directors, employees, agents, affiliates, successors and permitted assigns (collectively, "**Indemnified Party**") against any and all losses, damages, liabilities, deficiencies, claims, actions, judgments, settlements, interest, awards, penalties, fines, costs, or expenses of whatever kind, including reasonable attorney fees, that are awarded against Indemnified Party in a final non-appealable judgment (collectively, "**Losses**"), arising out of or resulting from any third-party claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena or investigation of any nature, civil, criminal, administrative, regulatory or other, whether at law, in equity or otherwise ("**Claim**") alleging:

(a)     A material breach or non-fulfillment of any material covenant set out in this Agreement by Indemnifying Party;

(b)     any grossly negligent or more culpable act or omission of Indemnifying Party or any of its representatives (including any reckless or willful misconduct) in connection with the performance of its obligations under this Agreement; or

(c)     any failure by Indemnifying Party to materially comply with any applicable federal, state or local laws, regulations or codes in the performance of its obligations under this Agreement.

4.2   <u>Exceptions and Limitations on Indemnification</u>. Despite anything to the contrary in this Agreement, Indemnifying Party is not obligated to indemnify or defend Indemnified Party against any Claim if such Claim or corresponding Losses arise out of or result from, in whole or in part, Indemnified Party's:

(a)     Negligence or more culpable act or omission (including recklessness or willful misconduct); or

(b)     Failure to comply with any of its obligations set out in this Agreement.

4.3   <u>Sole Remedy</u>. THIS SECTION 4 SETS FORTH THE ENTIRE LIABILITY AND OBLIGATION OF THE INDEMNIFYING PARTY AND THE SOLE AND

EXCLUSIVE REMEDY FOR THE INDEMNIFIED PARTY FOR ANY LOSSES
COVERED UNDER SECTION 4.

5.    <u>Miscellaneous</u>.

    5.1    <u>Further Assurances</u>. On the other party's reasonable request, each party shall, at its sole cost and expense, execute and deliver all such further documents and instruments, and take all such further acts, necessary to give full effect to this Agreement.

    5.2    <u>Survival</u>. Subject to the limitations and other provisions of this Agreement, the representations of the Parties contained in this Agreement survive the expiration or earlier termination of this Agreement for a period of three (3) years from the date of such expiration or termination. All covenants and agreements of any party contained herein survive the expiration or earlier termination of this Agreement for the period explicitly specified therein or if such period is not specified, for a period of three (3) years from the date of the expiration or termination of this Agreement. Despite the foregoing, any claim by any party asserted in good faith with reasonable specificity (to the extent known at such time) and in writing by notice before the expiration date of the applicable survival period (if any) is not thereafter barred by the expiration of the relevant period and such claims survive until finally resolved.

    5.3    <u>Notices</u>. Each party shall deliver all notices, requests, consents, claims, demands, waivers and other communications under this Agreement (each, a "**Notice**") in writing and addressed to the other party at its address set out below (or to such other address that the receiving party may designate from time to time in accordance with this section). Each party shall deliver all Notices by personal delivery, nationally recognized overnight courier (with all fees pre-paid), facsimile [or e-mail] (with confirmation of transmission) or certified or registered mail (in each case, return receipt requested, postage prepaid). Except as otherwise provided in this Agreement, a Notice is effective only (a) on receipt by the receiving party, and (b) if the party giving the Notice has complied with the requirements of this Section.

Notice to Assigning Party:                P.O. Box _____
                                             Facsimile:      [FAX NUMBER]
                                             E-mail: mmclindon@fpmi.com
                                             Attention:      Mark McLindon, CEO

with a copy to:                        Yumkas, Vidmar, Sweeney & Mulrenin, LLC
                                             Facsimile:      (410) 571-2798
                                             E-mail: psweeney@yvslaw.com
                                             Attention:      Paul Sweeney, Esq.

Notice to Assuming Party:                [BUYER ADDRESS]
                                             Facsimile:
                                             E-mail:
                                             Attention:

with a copy to:

                                                Facsimile:
                                                E-mail:
                                                Attention:

[Notice to Remaining Party:]            [[REMAINING PARTY'S ADDRESS]]
                                                [Facsimile: [FAX NUMBER]]
                                                [E-mail: [E-MAIL ADDRESS]]
                                                [Attention: [TITLE OF OFFICER TO
                                                RECEIVE NOTICES]]

       5.4     <u>Interpretation</u>. For purposes of this Agreement: (a) the words "include,"
"includes" and "including" is deemed to be followed by the words "without limitation"; (b)
the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto" and
"hereunder" refer to this Agreement as a whole. Unless the context otherwise requires,
references in this Agreement: (x) to sections, schedules and exhibits mean the sections of,
and schedules and exhibits attached to, this Agreement; (y) to an agreement, instrument or
other document means such agreement, instrument or other document as amended,
supplemented and modified from time to time to the extent permitted by the provisions
thereof; and (z) to a statute means such statute as amended from time to time and includes
any successor legislation thereto and any regulations promulgated thereunder. The parties
drafted this Agreement without regard to any presumption or rule requiring construction or
interpretation against the party drafting an instrument or causing any instrument to be
drafted. The schedules and exhibits referred to herein are an integral part of this Agreement
to the same extent as if they were set out verbatim herein.  Any reference to singular shall
include the plural as the case may be, and vice versa.

       5.5     <u>Headings</u>. The headings in this Agreement are for reference only and do not
affect the interpretation of this Agreement.

       5.6     <u>Severability</u>. If any term or provision of this Agreement is invalid, illegal or
unenforceable in any jurisdiction, such invalidity, illegality or unenforceability does not
affect any other term or provision of this Agreement or invalidate or render unenforceable
such term or provision in any other jurisdiction. On such determination that any term or
other provision is invalid, illegal or unenforceable, the parties to this Agreement shall
negotiate in good faith to modify this Agreement so as to effect the original intent of the
parties as closely as possible in a mutually acceptable manner in order that the transactions
contemplated hereby be consummated as originally contemplated to the greatest extent
possible.

       5.7     <u>Entire Agreement.</u> This Agreement, together with all related exhibits and
schedules, is the sole and entire agreement of the parties to this Agreement regarding the
subject matter contained herein and therein, and supersedes all prior and contemporaneous
understandings, agreements, representations and warranties, both written and oral, regarding
such subject matter.

5.8    <u>Amendment and Modification</u>. No amendment to or recission, termination or discharge of this Agreement is effective unless it is in writing, identified as an amendment to or recission, termination or discharge of this Agreement and signed by an authorized representative of each party to this Agreement.

5.9    <u>Waiver</u>.

(a)    No waiver under this Agreement is effective unless it is in writing, identified as a waiver to this Agreement and signed by an authorized representative of the party waiving its right.

(b)    Any waiver authorized on one occasion is effective only in that instance and only for the purpose stated, and does not operate as a waiver on any future occasion.

(c)    None of the following is a waiver or estoppel of any right, remedy, power, privilege or condition arising from this Agreement:

(i)    any failure or delay in exercising any right, remedy, power or privilege or in enforcing any condition under this Agreement; or

(ii)    any act, omission or course of dealing between the parties.

5.10    <u>Cumulative Remedies</u>. All rights and remedies provided in this Agreement are cumulative and not exclusive, and the exercise by either party of any right or remedy does not preclude the exercise of any other rights or remedies that may now or subsequently be available at law, in equity, by statute, in any other agreement between the parties or otherwise.

5.11    <u>Equitable Remedies</u>. Each Party acknowledges that a breach or threatened breach by it of any of its obligations under this Agreement would give rise to irreparable harm to the other Party for which monetary damages would not be an adequate remedy and hereby agrees that if a breach or a threatened breach by a Party of any such obligations, the other Party will, in addition to any and all other rights and remedies that may be available to it about such breach, be entitled to seek equitable relief, including a temporary restraining order, an injunction, specific performance and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond).

5.12    <u>No Third-Party Beneficiaries</u>. This Agreement benefits solely the parties to this Agreement and their respective successors and assigns and nothing in this Agreement, express or implied, confers on any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

5.13    <u>Choice of Law</u>. This Agreement and exhibits and schedules attached hereto, and all matters arising out of or relating to this Agreement, are governed by, and construed in accordance with, the laws of the State of Delaware, United States of America, subject to the laws of the Federal Bankruptcy Court.

5.14   <u>Choice of Forum</u>. Each party irrevocably and unconditionally agrees that it will not commence any action, litigation or proceeding of any kind whatsoever against the other party in any way arising from or relating to this Agreement, and exhibits and schedules attached hereto, and all contemplated transactions, including, but not limited to, contract, equity, tort, fraud and statutory claims, in any forum other than the United States Bankruptcy Court Eastern District of Virginia, Alexandria District or, if such court does not have subject matter jurisdiction, the United States District Court Eastern District of Virginia, Alexandria District, and any appellate court from any thereof. Each party irrevocably and unconditionally submits to the exclusive jurisdiction of such courts and agrees to bring any such action, litigation or proceeding only in United States Bankruptcy Court Eastern District of Virginia, Alexandria District or, if such court does not have subject matter jurisdiction, the United States District Court Eastern District of Virginia, Alexandria District. Each party agrees that a final judgment in any such action, litigation or proceeding is conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

5.15   <u>WAIVER OF JURY TRIAL</u>. EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT, INCLUDING EXHIBITS AND SCHEDULES ATTACHED TO THIS AGREEMENT, IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY ABOUT ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT, INCLUDING ANY EXHIBITS OR SCHEDULES ATTACHED TO THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED HEREBY. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF THE OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IF OF A LEGAL ACTION, (B) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (D) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

5.16   <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which is deemed an original, but all of which together is deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission is deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

*[signature page follows]*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the Effective Date.

FPMI Solutions, Inc.

By_____

Name:

Title:


[ASSUMING PARTY NAME]

By_____

Name:

Title:

**SCHEDULE 1**

**ASSIGNED CONTRACTS**

**SCHEDULE 2**

**NOVATION AGREEMENT**

WHEREAS, FPMI Solutions, Inc. ("**Assigning Party**") and [BUYER] ("**Assuming Party**") are parties to that ceratin Assignment Assumption and Novation agreement, dated _____, 2016 (the "**Assignment**"), attached hereto and made a part hereof, where Assigning Party assigned, and Assuming Party assumed, all rights and obligations under the contracts identified on Schedule 1 attached thereto (each an "**Assigned Contract**").

WHEREAS, [REMAINING PARTY] ("**Remaining Party**") is a party to one or more of those Assigned Contracts and desires to release Assigning Party of all obligations under the Contract and substitute, in place thereof, Assuming Party.

NO THEREFORE, in consideration of the mutual covenants, terms and conditions set out herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows

1. <u>Definitions</u>.  Capitalized terms not defined herein have the meanings ascribed to them in the Assignment.

2. <u>Release</u>.

   a.     Despite anything to the contrary in the Assigned Contracts, Remaining Party releases and forever discharges Assigning Party, as well as its shareholders, directors, officers, employees, agents and representatives, from all further obligations arising under the Assigned Contracts, and from all manner of actions, causes of action, suits, debts, damages, expenses, claims and demands whatsoever that Remaining Party has or may have against any of the foregoing persons, arising out of or in any way connected to performance under the Assigned Contracts on and after the Effective Date. For avoidance of doubt, except as provided in the Assignment Section 2.2, nothing herein affects any rights, liabilities, or obligations of Remaining Party or Assigning Party due to be performed before the Effective Date.

   b.     Despite anything to the contrary in the Assigned Contracts, Assigning Party releases and forever discharges Remaining Party, as well as its shareholders, directors, officers, employees, agents and representatives, from all further obligations arising under the Assigned Contracts, and from all manner of actions, causes of action, suits, debts, damages, expenses, claims and demands whatsoever that Assigning Party has or may have against any of the foregoing persons, arising out of or in any way connected to performance under the Assigned Contracts on and after the Effective Date. For avoidance of doubt, except as provided in the Assignment Section 2.2, nothing herein affects any rights, liabilities, or obligations of Remaining Party or Assigning Party due to be performed before the Effective Date.

   3.     <u>Substitution</u>. The parties intend that this Agreement is a novation and that the Assuming Party be substituted for the Assigning Party. Remaining Party recognizes Assuming Party as Assigning Party's successor-in-interest in and to the Assigned Contracts. Assuming

Party by this Agreement becomes entitled to all right, title and interest of Assigning Party in and to the Assigned Contracts in as much as Assuming Party is the substituted party to the Assigned Contracts as of and after the Effective Date. Remaining Party and Assuming Party shall be bound by the terms of the Assigned Contracts in every way as if Assuming Party is named in the novated Assigned Contracts in place of Assigning Party as a party thereto. Assigning Party represents and warrants that there is no payment or other liability of Assigning Party to Remaining Party which has accrued and remains outstanding as of the Effective Date.

4.    Interpretation. For purposes of this Agreement: (a) the words "include," "includes" and "including" is deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole. Unless the context otherwise requires, references in this Agreement: (x) to sections, schedules and exhibits mean the sections of, and schedules and exhibits attached to, this Agreement; (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof; and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. The parties drafted this Agreement without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The schedules and exhibits referred to herein are an integral part of this Agreement to the same extent as if they were set out verbatim herein. Any reference to singular shall include the plural as the case may be, and vice versa.

5.    Amendment and Modification. No amendment to or recission, termination or discharge of this Agreement is effective unless it is in writing, identified as an amendment to or recission, termination or discharge of this Agreement and signed by an authorized representative of each party to this Agreement.

6.    Choice of Law. This Agreement and exhibits and schedules attached hereto, and all matters arising out of or relating to this Agreement, are governed by, and construed in accordance with, the laws of the State of Delaware, United States of America, subject to the laws of the Federal Bankruptcy Court.

7.    Choice of Forum. Each party irrevocably and unconditionally agrees that it will not commence any action, litigation or proceeding of any kind whatsoever against the other party in any way arising from or relating to this Agreement, and exhibits and schedules attached hereto, and all contemplated transactions, including, but not limited to, contract, equity, tort, fraud and statutory claims, in any forum other than the United States Bankruptcy Court Eastern District of Virginia, Alexandria District or, if such court does not have subject matter jurisdiction, the United States District Court Eastern District of Virginia, Alexandria District, and any appellate court from any thereof. Each party irrevocably and unconditionally submits to the exclusive jurisdiction of such courts and agrees to bring any such action, litigation or proceeding only in United States Bankruptcy Court Eastern District of Virginia, Alexandria District or, if such court does not have subject matter jurisdiction, the United States District Court Eastern District of Virginia, Alexandria District. Each party agrees that a final judgment in any such action, litigation or proceeding is conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

Schedule 2

8.     <u>WAIVER OF JURY TRIAL</u>. EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT, INCLUDING EXHIBITS AND SCHEDULES ATTACHED TO THIS AGREEMENT, IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY ABOUT ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT, INCLUDING ANY EXHIBITS OR SCHEDULES ATTACHED TO THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED HEREBY. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF THE OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IF OF A LEGAL ACTION, (B) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (D) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

9.     <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which is deemed an original, but all of which together is deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission is deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[*signatures appear on the following page*]

Schedule 2

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date hereof.

[REMAINING PARTY NAME]

By_____

Name:

Title:


FPMI Solutions, Inc.

By_____

Name:

Title:


[ASSUMING PARTY NAME]

By_____

Name:

Title:

## EXHIBIT C

## FORM OF FIRPTA CERTIFICATE